**U.S. District Court in the District of Columbia September 28th, 2017**

**AMENDED COMPLAINT IN THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**'BIVENS ACTION' PART 1 (Pages 1- 60)**
**'FTCA' PART 2 (Pages 61-117)**

---

**Julian Marcus Raven**

Plaintiff

v.

**Mrs. Kim Sajet,**
Director, Smithsonian Institution
National Portrait Gallery
Victor Building
750 Ninth St. NW
Suite 410
Washington D.C. 20001

**And**

**Mr. Richard Kurin**
Acting Provost, Smithsonian Institution
Smithsonian Castle on the National Mall
1000 Jefferson Drive, SW, Art room 219
Washington D.C. 20013-7012

**And**

**The U.S.A.**

Defendants

**Case No. 17-cv-01240-CKK**
**Hon. Judge Kotelly**

---

## JURISDICTION

The District Court, For the District of Columbia, in Washington D.C. has subject matter jurisdiction since this case involves; "...the United States Constitution;" Pro-se handbook Page http://www.dcd.uscourts.gov/sites/dcd/files/ProSeNON-PRISONERManual.pdf

§ 11–501. Civil jurisdiction\

(4) Any civil action (other than a matter over which the Superior Court of the District of Columbia has jurisdiction under paragraph (3) or (4) of section 11-921(a)) begun in the court during the thirty-month period beginning on such effective date wherein the amount in controversy exceeds $50,000.

## HISTORICAL & LEGAL CONTEXT OF THE SMITHSONIAN INSTITUTION

"James Smithson, esquire, of London, in the Kingdom of Great Britain, having by his last will and testament given the whole of his property to the United States of America, to found at Washington, under the name of the "Smithsonian Institution," an establishment for the increase and diffusion of knowledge among men; and the United States having, by an act of Congress, received said property and accepted said trust; Therefore, For the faithful execution of said trust, according to the will of the liberal and enlightened donor;" 29th Congress, 1st Session, August 10th, 1846

"SEC. 2. And be it further enacted, That so much of the property of the said James Smithson as has been received in money, and paid into the Treasury of the United States, being the sum of five hundred and fifteen thousand one hundred and sixty-nine dollars, be lent to the United States Treasury at six per cent per annum interest..." Smithsonian Act of Congress

1846

“SEC 3. And be it further enacted, That the business of the said Institution shall be conducted at the City of Washington by a board of regents, by the name of regents of the "Smithsonian Institution," Smithsonian Act of Congress 1846

“The Smithsonian Institution is a “trust instrumentality” of the United States—an organization established by the U.S. government as a public trust. Created by the US Congress on August 10, 1846, through 9 Stat. 102, the Institution carries out the bequest of James Smithson (1765-1829) to create an establishment “for the increase and diffusion of knowledge among men.” https://siarchives.si.edu/history/legal-history

Article 2: “The Government Of The United States is merely a trustee to carry out the design of the testator.” ‘Programme Of Organization’ by Secretary Joseph Henry adopted on December 13th, 1847 by the Board Of Regents.

Article 3: “The institution is not a national establishment, as is frequently supposed, but the establishment of an individual, and is to bear and perpetuate his name.” ‘Programme Of Organization’ by Secretary Joseph Henry adopted on December 13th, 1847 by the Board Of Regents.

“The Smithsonian Institution is an establishment based upon the private foundation (italics Added) of James Smithson, a British subject, which was accepted by the United States in trust. This establishment was created by an act of Congress, under which act, with one or two unimportant modifications, it has since been governed. The United States Government

has, from time to time, assigned to it important functions, and Congress has passed laws and made appropriations in support of these. While, therefore, it is a private foundation (Italics Added), of which the Government is trustee, it has in itself an extensive legislative history." S.P. Langley Secretary Of The Smithsonian Institution, The Smithsonian Institution Documents to its origin and history. 1835---1899 By William J. Rhees

The nature of the benevolent trust bequeathed by Mr. James Smithson for the 'increase and diffusion of knowledge' will only ever end once all knowledge has been 'increased and diffused among men.' Until such a time, the original intent of the testator and the establishment's founding mission and legal structure remain as originally enacted by Congress on August 10th, 1846 in the Smithsonian Institution Act.

**Smithsonian Institution Statement of Values And Ethics, 2007**

"The Smithsonian Institution is a **public trust** whose mission is the increase and diffusion of knowledge. The Smithsonian was established by the United States Congress to carry out the **fiduciary responsibility** assumed by the United States in accepting the bequest of James Smithson to create the Smithsonian Institution." Smithsonian Statement Of Values and Code of Ethics, 2007

"**We are accountable to the general public** as well as to the Smithsonian's multiple stakeholders in carrying out this responsibility. **We recognize that the public interest is paramount.**" Smithsonian Statement Of Values and Code of Ethics, 2007

"Serving the Smithsonian is a privilege and those who work on its behalf have a responsibility to maintain the **highest standards of honesty, integrity, professionalism, and loyalty to the Institution.**"

"We **must ensure** that our activities support the Smithsonian mission and **take care to avoid** conduct that would compromise the integrity of or **public confidence** in the Smithsonian. We acknowledge that in order to merit and **preserve the public trust** we must maintain a shared commitment to core values and **an expectation of ethical and professional conduct** in **all** of our activities." Smithsonian Statement Of Values and Code of Ethics, 2007

"This Statement of Values and Code of Ethics **establishes the standards** and principles for ethical conduct that **apply to the Institution collectively and to all members** of the Smithsonian community, **which includes Regents**, **staff**, volunteers, advisory board members, fellows, interns, research associates, affiliated individuals, and others who have been entrusted to act on behalf of or in the name of the Smithsonian."

"The Board of Regents was established by Congress to carry out the responsibilities of the United States **as trustee** of the Smithson trust.

"Given this **unique and special status**, the Smithsonian **must be mindful** that it **is a public trust** operating on **behalf of the American public** and the United States government to carry out its mission to increase and diffuse knowledge."

"As such, the Smithsonian will be guided by the **principles of the federal sector** in the conduct of its activities whenever appropriate and consistent with its mission and trust responsibilities."

"In all other cases, the Institution will follow the principles and best practices **for fiduciary stewardship** in the nonprofit sector." Smithsonian Statement Of Values and Code of Ethics, 2007

"The Smithsonian Institution is committed to operating in a culture marked by **openness,** accessibility, and **robust communication**" Smithsonian Statement Of Values and Code of Ethics, 2007

"**Effective transparency** also requires open and reliable communication between the Board, management, and other stakeholders to support informed decision making." Smithsonian Statement Of Values and Code of Ethics, 2007

"**Each member** of the Smithsonian community is expected to act in accordance with professional standards, as well as with **honesty, integrity, openness, accountability**, and a commitment to excellence." Smithsonian Statement Of Values and Code of Ethics, 2007

"The Smithsonian promotes a working environment that values **respect, fairness**, and **integrity**." Smithsonian Statement Of Values and Code of Ethics, 2007

"We act in accordance with these values by treating our colleagues**, the public**, and others with whom we interact with **dignity, civility, and respect**." Smithsonian Statement Of Values and Code of Ethics, 2007

"We are each **responsible** for being **aware of and complying** with applicable professional standards that govern our conduct, including those that relate to our particular discipline." Smithsonian Statement Of Values and Code of Ethics, 2007

"**COMPLIANCE WITH APPLICABLE LAWS All Smithsonian activities** will be conducted in compliance with **applicable laws**, **regulations**, and international conventions. **Members** of the Smithsonian community **are expected** to **become familiar with and comply with the laws** and regulations that apply to their areas of responsibility." Smithsonian Statement Of Values and Code of Ethics, 2007

**"COMPLIANCE WITH SMITHSONIAN POLICIES, DIRECTIVES, AND PROCEDURES All** Smithsonian activities **will be conducted in accordance** with **established policies**, **directives, and procedures**, which are designed to set standards for **acceptable practices** and activities. Members of the Smithsonian community are expected to conduct their **activities in conformance with applicable policies, directives, and procedures** and accordingly have **an obligation** to become familiar with those that apply to their areas of

responsibility." Smithsonian Statement Of Values and Code of Ethics, 2007

"CONFLICTS OF INTEREST All members of the Smithsonian community have a duty to **act in the best interest** of the Smithsonian rather than in furtherance of their personal interest or for private gain. We must **avoid apparent** or **actual conflicts** of interest and ensure that potential conflicts of interest **are disclosed and managed** in accordance with applicable guidelines, directives, and standards of conduct." Smithsonian Statement Of Values and Code of Ethics, 2007

"**GOVERNANCE** The Board of Regents is the governing authority for the Smithsonian and has **the ultimate authority and responsibility** for ensuring that Smithsonian resources, programs, and **activities support the Smithsonian mission**." Smithsonian Statement Of Values and Code of Ethics, 2007

"The Board of Regents is responsible for establishing the strategic direction of the Institution, providing guidance on and oversight of Smithsonian policies and operations, ensuring that Smithsonian **resources are** responsibly and prudently managed in compliance **with legal** and **ethical requirements**, and regularly assessing the effectiveness of Smithsonian programs." Smithsonian Statement Of Values and Code of Ethics, 2007

"**Regents are expected to understand** their governance responsibilities and to devote the time and attention necessary to fulfill them." Smithsonian Statement Of Values and Code of Ethics, 2007

"**The Board of Regents takes action** as a body through the **collective judgment** of its members." Smithsonian Statement Of Values and Code of Ethics, 2007

"**Individual Regents** do not represent the Board, except as may be authorized by the Board." Smithsonian Statement Of Values and Code of Ethics, 2007

" The Secretary and appropriate staff ensure that the Board of Regents is provided with timely, accurate, and complete information to enable the Regents to fulfill their

responsibilities." Smithsonian Statement Of Values and Code of Ethics, 2007

"**Managers** and supervisors are **expected to lead by example**, establishing and following a **high standard of ethics and accountability** to be adhered to at all levels of their organizations." Smithsonian Statement Of Values and Code of Ethics, 2007

"Policies and practices to **ensure compliance** with these principles, as well as **consistency** with professional standards and best practices for responsible stewardship and internal control, **are established, disseminated, kept current, and consistently applied at all levels** of the organization." Smithsonian Statement Of Values and Code of Ethics, 2007

"**<u>Accurate and complete records</u>** are maintained to support reliable financial reporting and to **ensure accountability** and positive control of the Smithsonian's physical and financial assets." Smithsonian Statement Of Values and Code of Ethics, 2007

"**COLLECTIONS** The Smithsonian develops, maintains, preserves, studies, exhibits, and interprets **collections of art**, artifacts, natural specimens, living animals and plants, images, archival and library materials, and audiovisual and digital media of unparalleled scope, depth, and quality. **Stewardship of Smithsonian collections** entails **<u>the highest public trust</u>** and carries with it the responsibility to provide **prudent and responsible** management, **<u>documentation</u>**, preservation, and use of the collections **for the benefit of the public**." Smithsonian Statement Of Values and Code of Ethics, 2007

"The Smithsonian conducts these activities in accordance with professional standards and practices and ensures **that legal requirements** are observed and **<u>compliance is documented</u>**. Policies and practices to ensure compliance with these principles and consistency with professional standards and best practices for responsible collections stewardship are established, clearly articulated, disseminated, kept current, and **consistently applied**." Smithsonian Statement Of Values and Code of Ethics, 2007

"**EXHIBITIONS,** EDUCATION, AND PUBLIC PROGRAMS To carry **out its mission to**

**increase and diffuse knowledge**, the Smithsonian engages in and supports a vast array of exhibitions and educational and public programs in science**, art**, history, and culture. The Smithsonian **conducts these activities** in accordance with professional standards and practices and ensures **that accuracy and intellectual integrity** are the foundation for all exhibitions and educational and public programs produced in its name or under its auspices." Smithsonian Statement Of Values and Code of Ethics, 2007

"We acknowledge and **address diverse values**, **opinions,** traditions, and concerns and ensure that **our activities are open and widely accessible**. Policies and practices **to ensure compliance** with these principles and consistency with professional standards and best practices are established, **clearly articulated**, disseminated, kept current, and **consistently applied.**" Smithsonian Statement Of Values and Code of Ethics, 2007

"TRANSPARENCY AND DISCLOSURE The Smithsonian provides accurate and comprehensive information about its finances, operations, and activities to the public, Congress, and other stakeholders and responds in a timely manner to reasonable requests for information. We engage in open and reliable communication between and among the Board of Regents, management, and other stakeholders to support informed decision making." Smithsonian Statement Of Values and Code of Ethics, 2007

"INCLUSIVENESS AND DIVERSITY The **Smithsonian values and promotes inclusiveness** and **diversity in all** of its activities, including employment practices, board and volunteer recruitment, and programs. The Smithsonian is enriched and its effectiveness enhanced when the Smithsonian community and the constituents we serve are composed of diverse individuals with varied backgrounds, experience, **<u>and points of view</u>**. "Smithsonian Statement Of Values and Code of Ethics, 2007

"IMPLEMENTATION While the **Board of Regents retains** the ultimate responsibility for requiring and overseeing compliance with this Statement of Values and Code of Ethics, each

Regent, employee, volunteer, and other member of the Smithsonian community to whom it applies has a **personal responsibility to comply** with this Statement. The Secretary will ensure that the **Statement is widely disseminated** to Regents, staff, volunteers, advisory board members, and other members of the Smithsonian community, **as well as to the public** and interested stakeholders. The Secretary will ensure that appropriate policies and directives providing necessary guidance are in place and kept current. The Secretary, in consultation with the General Counsel, will establish an internal Ethics Advisory Board to provide advice to the Secretary and Board of Regents on compliance with this Statement of Values and Code of Ethics." Smithsonian Statement Of Values and Code of Ethics, 2007 https://www.si.edu/content/governance/pdf/Statement_of_Values_and_Code_of_Ethics.pdf

**THE PARTIES**

Plaintiff 'pro se' Julian Marcus Raven is a citizen of Elmira, New York and a professional artist. Mr. Raven is married with three children. Mr. Raven is the artist who painted the Donald Trump portrait/painting 'Unafraid and Unashamed' in the summer of 2015 about which this case is regarding.

Mrs. Kim Sajet, individually. The Smithsonian Institution's National Portrait Gallery Director and Mr./Dr. Richard Kurin, individually, Smithsonian Acting Provost.

**NATURE OF ACTION AGAINST NAMED FEDERAL OFFICIALS MRS. KIM SAJET, DIRECTOR & MR./DR. RICHARD KURIN, SMITHSONIAN ACTING PROVOST**

This is a civil action for compensatory and punitive damages according **Bivens v. Six**

**Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)** against Mrs. Kim Sajet, Director of the Smithsonian Institution's National Portrait Gallery, acting in her individual capacity for counts 1 + 2.

This is a civil action for compensatory and punitive damages according **Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)** against Mr. Richard Kurin, Smithsonian Acting Provost acting in his individual capacity for count 2.

**Count 1.** 1st Amendment political free speech violations and viewpoint discrimination.

A first Amendment political free speech 'Bivens Action' will be considered a new context and a new cause of action. But since there are no 'special factors counseling hesitation in the absence of affirmative action by Congress.' " (Carlson, supra, at 18.) Plaintiff's claims will demonstrate the appropriate use of Bivens as the remedy for plaintiff's deprivations.

In Ziglar v Abasi, the Supreme Court said 'The proper test for determining whether a claim arises in a new Bivens context is as follows;

"If the case is different in a meaningful way from previous Bivens cases decided by this Court, then the context is new.

Meaningful differences **may** include, e.g.,

the rank of the officers involved**;(High Ranking – Davis v. Passman. *added*)**

the constitutional right at issue; **(Fundamental Constitutional right. *added.)***

the extent of judicial guidance for the official conduct**; (Abundance of judicial guidance. *added.)***

the risk of disruptive intrusion by the Judiciary into the functioning of other branches; **(No**

**risk, simple matter of settled law. *added*.)** or the presence of potential special factors not considered in previous Bivens cases.**(Meaningful special factors not counseling hesitation. *added*.)** …Respondents' detention policy claims bear little resemblance to the three Bivens claims the Court has approved in previous cases.( Bivens, Davis, and Carlson )" Ziglar v. Abbasi 582 US ___ (2017)

49. It is obvious in Ziglar v. Abassi why a Bivens action was not granted and counseled hesitation. Plaintiff's case presents itself in complete contrast, resembling the 'characteristics' of the three approved 'contexts' for a Bivens action, Bivens, Davis and Carlson. Thus a new 1st Amendment free speech cause of action is appropriate.

'Special Factors' in Mr. Raven's case do not 'counsel hesitation' but martial the powers of the Court to intervene as the only remedy Mr. Raven has to relief from the deprivations he has suffered having exhausted all other remedies. Punitive damages and a jury trial are both permitted under a Biven's action, which is part of the remedy plaintiff seeks.

**Count 2**. 5th Amendment to the United States Constitution 'due process of law' and 'equal protection' violations

"No person… shall be deprived of life, liberty, or property without the due process of law."

A 'Bivens action' claiming 5th Amendment 'due process' violations fits perfectly under one of the three already approved Supreme Court causes for permissible actions.

"A cause of action and damages remedy can be implied directly under the Constitution when the Due Process Clause of the Fifth Amendment is violated. Cf. Bivens v. Six Unknown

Fed. Narcotics Agents, 403 U. S. 388; Butz v. Economou, 438 U. S. 478. Pp. 442 U. S. 233-249. (a) The equal protection component of the Fifth Amendment's Due Process Clause confers on petitioner a federal constitutional right to be free from … **(In this case, arbitrary deprivations of the 'due process of law' through egregious procedural violations, arbitrary unconstitutional government decision making, deprivations of rights of official, of record, written responses regarding 'notice and hearing', Deprivation of the right to appeal and to be heard and deprivations of liberty and property.** ***Parentheses added)***Pp. 442 U. S. 234-235.

(b) The term "cause of action," as used in this case, refers to whether a plaintiff is a member of a class of litigants that may, as a matter of law, appropriately invoke the power of the court. Since petitioner rests her claim directly on the Due Process Clause of the Fifth Amendment, claiming that her rights under that Amendment have been violated and that she has no effective means other than the judiciary to vindicate these rights, she is an appropriate party to invoke the District Court's general federal question jurisdiction to seek relief, and she therefore has a cause of action under the Fifth Amendment." **Davis v. Passman, 442 U.S. 228 (1979)**

**Liberty & Property Interests in Plaintiff's Claims**

"No person shall be deprived of life, liberty, or property without due process of law" 5th Amendment to the United States Constitution

"Liberty" and "property" are broad and majestic terms. They are among the "[g]reat [constitutional] concepts . . . purposely left to gather meaning from experience. . . . [T]hey relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged." For that reason, the

Court has fully and finally rejected the wooden distinction between "rights" and "privileges" that once seemed to govern the applicability of procedural due process rights. The Court has also made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money. By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process. "**BOARD OF REGENTS v. ROTH, 408 U.S. 564** "While this Court has not attempted to define with exactness the liberty . . . guaranteed [by the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." **Meyer v. Nebraska, 262 U.S. 390, 399** . In a Constitution for a free people, there can be no doubt that the meaning of "liberty" must be broad indeed. ""**BOARD OF REGENTS v. ROTH, 408 U.S. 564 (1972)**

"...Certain attributes of "property" interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, **have a legitimate claim of entitlement to it.** It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. **It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims**." **BOARD OF REGENTS v. ROTH, 408 U.S. 564 (1972)**

Plaintiff's participation or rights of 'property' in the Smithsonian National Portrait Gallery extends further and deeper than if the institution were 'simply' a national establishment to which citizens would have a constitutional protected participatory right, that being the very reason for its existence. Participation in the Smithsonian is unique because the institution is a unique composition of trust and government. The Smithsonian is a 'gift' in trust to the American people, administered by Congress as trustee through the Board of Regents also trustees.

Congress created compound rights of participation for both trust beneficiaries and citizens protected and all times and by all means by the Smithsonian Act of Congress and the Smithsonian charter, rules, procedures, standards, code of ethics and regulations enshrouded by and established upon at all times the United States Constitution and the Bill of Rights.

Mr. Raven had the 'property' right to apply to the Smithsonian as citizen but more importantly as 'trust' beneficiary. A 'prima facie' example of Smithsonian participation is in the Smithsonian Act "SEC. 10. *And be it further enacted*, That the author or proprietor of any book, map, chart, musical composition, print, cut, or engraving, for which a copy-right shall be secured under the existing acts of Congress, or those which shall hereafter be enacted respecting copy-rights, shall, ***within three months from the publication*** of said book, map, chart, musical composition, print, cut, or engraving, ***deliver, or cause to be delivered***, one copy of the same to the Librarian of the Smithsonian institution, and one copy to the Librarian of Congress Library, for the use of the said Libraries." This clause is not even an option, suggestion or invitation, it is a command to participate, 'Within three months'...'deliver, or cause to be delivered' is imperative!

Granted portrait acceptance is a procedurally controlled participation, the spirit behind the clause demonstrates the inextricable relationship between the trust and the beneficiary's participation, thus creating a clear beneficiary 'property' interest, thus a constitutionally protected right!

One is left with a question, 'from where did the Smithsonian Institution acquire its collections?', if not primarily from its inception by the participation, contributions, and donations etc. of individual private citizen trust beneficiaries.

Mr. Raven had the right to participate in the Smithsonian National Portrait Gallery application procedure according to established rules, procedures and standards as both a trust beneficiary and citizen, which constitutes a 'property' right.

Mr. Raven had the right to expect fair and legal 'due process of law' proceedings from the government institution.

Mr. Raven had the right to expect a fair and professional consideration of his fine art application according to Smithsonian standards, rules and procedures.

Mr. Raven had the right to expect 'equal protection' of his rights under the law.

Mr. Raven had the right to be able to exercise his Constitutionally protected political free speech rights in a limited public forum, run by a government instrumentality.

Mr. Raven had the right to hear the truth from Smithsonian government employees.

Mr. Raven had the right to be treated fairly and respectfully by federal employees.

Mr. Raven had the right to be free from mental anguish, frustration, anger, the constant feeling of having one's rights violated by government officials, discouragement, depression as a result of arbitrary federal employee's behavior.

Mr. Raven had the right to participate in his portion, which constitutes 'property' of the will and trust of Mr. James Smithson as a 'trust' beneficiary as a Citizen of the United States of American, to which Mr. Smithson bequeathed his entire property.

Mr. Raven had the right to appeal.

Mr. Raven had the right to an appeal process.

Mr. Raven had the right to be heard in an appeal hearing.

**Qualified Immunity**

Mrs. Kim Sajet's actions constituted clear violations of the 1st & 5th Amendments to the United States Constitution. These actions may invoke an initial attempt at a 'qualified immunity' defense, but her actions clearly fulfill the test Government Officials actions must meet in order to puncture the veil of a 'qualified immunity' defense. "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." ( Saucier v. Katz, 533 U.S. 194, 201 (2001).)

"To be held liable under Bivens, the defendant must have participated personally in the alleged wrongdoing; liability cannot be premised upon a theory of vicarious liability or respondeat superior. See **Iqbal, 556 U.S. at 676** ("Because vicarious liability is inapplicable to Bivens . . . suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); accord **Cameron v. Thornburgh, 983 F.2d 253, 258 (D.C. Cir. 1993)." Anderson v Gates Civil Action No. 12-1243 (JDB)**

"…To overcome a claim of qualified immunity, a plaintiff must show (1) that the facts alleged or shown make out a violation of a constitutional right, and (2) that the right was clearly established at the time of the violation. See **Saucier v. Katz, 533 U.S. 194, 201 (2001).** The Supreme Court in **Pearson v. Callahan, 555 U.S. 223, 236 (2009),** modified the Saucier approach such that lower courts may use their discretion to decide which of the two prongs to address first. Accord Reichle, 132 S. Ct. at 2093." **Anderson v Gates Civil Action No. 12-1243 (JDB)"**

**1. "…that the facts alleged or shown make out a violation of a constitutional right."**
**2. "…that the right was clearly established at the time of the violation…"**
**Anderson v Gates Civil Action No. 12-1243 (JDB)"**

**Smithsonian Employee Duty**

"The Smithsonian Institution is a **public trust** whose mission is the increase and diffusion of knowledge …the **<u>fiduciary responsibility</u>** …**We are accountable to the general public… We recognize that the public interest is paramount…** maintain the **highest standards of honesty, integrity, professionalism, and loyalty to the Institution… take care to avoid** conduct… compromise the integrity of or **public confidence… preserve the public trust… an expectation of ethical and professional conduct** in **all** of our activities… **apply to the Institution collectively and to all members… includes Regents**, **staff… must be mindful** that it **is a public trust…** on 2 **behalf of the American public…** marked by **openness… robust communication… Effective transparency… Each member…** with **honesty, integrity, openness, accountability…** that values **respect,**

**fairness**, and **integrity**… **responsible** for being **aware of and complying… All Smithsonian activities…** compliance with **applicable laws**, **regulations**, and international conventions… **All** Smithsonian activities **will be conducted in accordance** with **established policies**, **directives, and procedures…** compliance **with legal** and **ethical requirements…. high standard of ethics and accountability…. ensure compliance… consistency…. are established, disseminated, kept current, and consistently applied at all levels** of the organization… **the highest public trust… prudent and responsible… documentation….** ensures **that legal requirements** are observed and **compliance is documented… that accuracy and intellectual integrity…**We acknowledge and **address diverse values**, **opinions,… consistently applied…** The **Smithsonian values and promotes inclusiveness** and **diversity in all** of its activities… **and points of view….**" Smithsonian Statement of Values and Code of Ethics, 2007

Mrs. Sajet, a 'Covered Executive' at the Smithsonian Institution was clearly briefed on the Director's legal responsibilities under Federal Law, Federal Statues of Ethical Conduct by the Smithsonian Office Of General Counsel at the outset of the Director's tenure at the Smithsonian Institution.

""Covered Executives," for purposes of this directive, includes but is not limited to the Secretary of the Smithsonian, all direct reports to the Secretary, and all Unit Directors with broad decision-making authority within the Institution. All individuals whose positions are designated as Covered Executive are notified of such at the time they either receive their offer of employment or transfer to a new position within the Smithsonian that is designated as a Covered Executive. All Covered Executives **must contact the General Counsel** to be briefed **on their responsibilities under these Standards of Conduct** within thirty (30) days of hire or assumption of a Covered Executive position. A list of current Covered

Executives is updated annually and available on the OGC Prism website." Smithsonian Standards of Conduct https://www.si.edu/content/ogc/sd103.pdf

Director Sajet was also specifically directed by the Smithsonian Institution to be self informed and thus personally responsible, thus personally liable in the areas of applicable Federal law so as to avoid prosecution under Federal law. Legal counselors are available to give advice about how the Director's 'planned' conduct may have violated Federal law. If the Director of the National Portrait Gallery had of followed procedure, the Director would have consulted with the legal counselors as to the Director's planned actions against plaintiff. Since it is obvious Director Sajet did not, then the Director ignored Smithsonian legal procedural directives specifically relating to Federal law issues and acted willfully, deliberately, intentionally, recklessly with complete disregard to the procedural 'due process of law' at the National Portrait Gallery. "No person shall be deprived of ...liberty and property without the due process of law" 5th Amendment to the United States Constitution.

"Apart from disciplinary or remedial action by the Smithsonian arising from a violation of these standards, civil and criminal penalties may be imposed for violation of federal statutes, to the extent that such statutes are applicable to federal or trust fund employees. **It is the responsibility of Smithsonian employees to be aware of applicable statutes and to *ensure* that their conduct does not violate federal laws..."** Ethics Counselors are available to advise employees about how their conduct, or planned activities, might violate federal statutes." Smithsonian Institution Standards of Conduct https://www.si.edu/content/ogc/sd103.pdf

Thus, Mrs. Sajet acted with full knowledge of the law unless the Director ignored and disobeyed specific Smithsonian Institution directives to be educated, informed and personally responsible concerning such matters, if and when in doubt, to seek legal counsel 'before' taking action. 'Due process' was ignored and violated no matter which path was chosen by the Director since the Smithsonian Institution's process of art consideration was said to be a 'rigorous selection 'process' made by the 'curators and directors'[1]. And remember this claim is against the 'Director' of a National Institution. If the Director does not know how to act, then who is left? Any claims of ignorance by Director Sajet are a confession of willful disobedience, willful ignorance, willful failure to follow established protocols and procedures, irresponsibility, negligence and the dereliction of duty.

Any actions conducted under these conditions are nothing but a reckless disregard for the Will of James Smithson "…an institution for the increase and diffusion of knowledge among men.", the Smithsonian Act of Congress of 1846, the 'Programme Of Organization' and the most recent 2007 Smithsonian 'Statement of Values and Code of Ethics' and the 1st and 5th Amendments to the United States Constitution.

Director Sajet's motive can be clearly discerned by her actions and by her anti-Trump bias, that outside of plaintiff's case are documented on the NPGDirector's Twitter feed, @NPGDirector. The Director's 'intent' can be seen in her actions towards plaintiff in the manner of her phone call and the contents of her objections, which reveal a hostile anti-- Trump political bias. The 'back tracking' during the phone conversation reveals the Director clearly 'knew' what she was saying was unlawful. The Director's final taunting remarks are

[1] Interestingly as of 9.26.2017 the answer to the Smithsonian FAQs "I would like to donate an object to the Smithsonian Institution?" has been changed. It no longer contains the words 'rigorous 'selection' process' , 'truly fills a gap', 'by the museums curators and

evidence of her motive. The Court will determine that the Director either 'knew' that she was willfully violating plaintiff's 1st Amendment political free speech civil rights and 5th Amendment 'due process' rights or that the Director was acting recklessly with complete indifference & disregard to plaintiff's 1st & 5th Amendment civil rights. It is either one or the other and yet both standards are sufficient to puncture the veil of a qualified immunity defense.

"To allow this action will make publick officers more careful to observe the constitution of cities and boroughs, and not to be so partial as they commonly are in all elections, which is indeed a great and growing mischief, and tends to the prejudice of the peace of the nation..." Ashby v White (1703) 92 ER 1

**BACKGROUND OF EVENTS**

On July 9th, 2015 Mr. Raven embarked upon a creative artistic and political journey that involved painting the now historic, patriotic, predictive and symbolic portrait of then presidential candidate Donald J. Trump. The nearly 8x16 foot painting in acrylics on stretched canvas and beautifully framed in a decorative red, white and blue frame became the most recognized pro-Trump political portrait/painting during the 2015---2016 campaign.

From New York to Los Angeles, reactions to the painting often ended with the comments that this painting should end up in the Smithsonian National Portrait Gallery in Washington D.C. After an historic grassroots political campaign, candidate Trump became the President of The United States on November 8th, 2016. What followed was the disturbing and disheartening experience with the Smithsonian National Portrait Gallery and The

Smithsonian Institution.

On November 21st, 2016, less than two weeks after the election of Donald J. Trump, plaintiff did go in person to the Smithsonian Affiliate in Corning, New York, The Rockwell Museum of Art to request assistance submitting an application to the Smithsonian National Portrait Gallery (Hereinafter "NPG") to show his Trump Portrait 'Unafraid And Unashamed' as part of the festivities for the 2017 Inauguration. Plaintiff was told that Director Swain and Executive Smithsonian Liaison Campbell were at lunch. Upon his return after lunch he was told they were both now gone for the day. It seemed odd to the plaintiff!

Plaintiff did follow up with an application by email to the attention of Director Kristen Swain and Rockwell/Smithsonian liaison Patty Campbell. Upon no reply after a week, plaintiff did go in person again on Monday the 28th of November with application and prints in hand. This time Executive Smithsonian Liaison Campbell did come down. The expression on her face was very cold, it was as if her face was frozen, no emotions were present. No warmth at the first personal meeting, just an expression devoid of emotional warmth. The cold shoulder was now evident!

Plaintiff asked if she had received the email application to which she said she had. Executive Liaison Campbell was quick to inform plaintiff that since The Rockwell Museum was a 'non--profit' organization they could not get involved with 'politics'. Plaintiff was quick to remind Ms. Campbell that at the end of October, 2016 less than two weeks before the general election the Rockwell Museum had Hollywood Actor, Democrat Political Activist, DNC speaker, Bernie Sanders Activist, Former Whitehouse Director for Youth Engagement under President Obama, Kal Penn come as a special guest speaker to the museum. Kal Penn

spoke on 'Art and Politics'.

Executive Smithsonian Liaison Campbell was stopped in her tracks! Plaintiff asked for help since time was passing quickly with just under two months before the election. Plaintiff's request was for either help forwarding the application to the NPG or an invitation to be involved and become a sponsor of the event since it could have a great and positive impact for our depressed local upstate New York region.

The next day, Director Kristen Swain responded via a short email. She informed plaintiff that the Rockwell Museum was unable to help since they did not have the 'resources'! Out of curiosity plaintiff spoke with Actor Kal Penn's agent to find out what is would cost to have him come and speak at a similar event to what just took place at the Rockwell Museum just a few weeks prior. Plaintiff was told it would cost $60,000.00!

Plaintiff subsequently did file an official complaint with the Smithsonian Director of Affiliations Harold Closter against the Rockwell Museum for their overt anti---conservative, anti---Trump bias and for failing to simply assist plaintiff in submitting his application to the NPG. The Rockwell Museum claimed to be an affiliate of the Smithsonian connecting our community to the Smithsonian. Director Closter did inform plaintiff that same day, the 30th of November 2016, that had forwarded the email as requested. Out of all the officials involved in this fiasco, Director Closter behaved with courtesy and professionalism!

**FACTUAL ALLEGATIONS**

Upon receiving confirmation of said application Mr. Raven did call the Director of the

Smithsonian NPG Kim Sajet on the morning of December 1st. 2016 at around 11:20 a.m. to inquire as to the 'application' process. Mr. Raven wanted to ensure that there was nothing lacking in the 20 plus page application document, which included letters of recommendation from elected representatives from upwards of 200,000 people. These included Congressman Tom Reed, New York Senator Tom O'Mara, Elmira Mayor Dan Mandell, New York GOP chairpersons, Cox, Cady, King, Strange, radio personality Frank Acomb and art collectors Gates/Davis.

Plaintiff did learn that the Director was not available, that she was not in. After leaving his phone number with the assistant to the Director of the NPG, since she informed plaintiff that the Director was not in or available that day. Plaintiff expected a call the next day or thereafter to inform him of any further steps necessary for the application process.

Within 15 minutes of the initial phone call to the assistant, plaintiff's phone rang. It was a call from the same number plaintiff had just dialed. It was to his surprise Director Kim Sajet! The Director's actions evince a "Specific Intent" by responding so quickly to plaintiff's call, less than 24 hours since the application and less than 15 minutes after plaintiff's initial call. Remember plaintiff was told the Director was not even in or available! Something motivated the Director to make special effort.

What was the motive for this call? Could this rapid response mean a keen and excited interest in plaintiff's application, proposal and desire to show his Trump painting, due to the fast approaching inauguration? Could this call be the answer to the 'information request' to an officer delegate of the Board Of Regents and Trustees, plaintiff had made as a 'beneficiary' of the Will Of James Smithson?

No, instead the call immediately manifested another "specific intent" and was instantly thus a violation because plaintiff's 'information request' was ignored, and the ensuing dialogue bypassed said request. Plaintiff had the feeling that the Director wanted to give him a 'piece of her mind.'

This surprise call would lead to an eleven minute dialogue and at times argument with the NPG Director Sajet, as the Director would lay out her partial, dishonest, arbitrary and personal anti-Trump 'objections' as to why the National Portrait Gallery would not even consider plaintiff's painting for the application process, all the while violating and ignoring Smithsonian standards. The Painting was refused even before given a fair and objective consideration according to Smithsonian Institution standards.

Plaintiff was left stunned, as if stung by a swarm of bees!

**DIRECTOR KIM SAJET OBJECTIONS:**

These objections ranged from its size being 'too big' to partially and incorrectly citing an NPG standard for acceptance, to claiming the image was too 'Pro-Trump', 'Too Political', 'not neutral enough' and finally 'no good'.

**"TOO BIG"**

"For the reasons given by the Court, I agree that the Free Speech Clause of the First Amendment forbids what respondents have done here."

**Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist. (91---2024), 508 U.S**

Without any cordial, official written response, Director Sajet by phone began to object to the Trump Portrait. It is clear from the first objection about the size that the director was rushing to judgment and expressing a personal, partial and biased opinion. Nowhere in the Smithsonian Institution's standards of acceptance for portraiture is there any mention of supposed appropriate sizes of paintings! The hasty phone call less than 24 hours after the application had been received, calls into question whether Director Sajet even consulted with Chief Curator Brandon Brame Fortune or any other official at that time, as is required by Smithsonian procedures when considering a painting, this fact is yet to be discovered. Smithsonian FAQ[2] "The Smithsonian acquires thousands of objects and specimens each year for its collection holdings through donation, bequest, purchase, exchange, and field collecting. The Institution accepts only items that truly fill a gap in the collections and then only after careful consideration by museum curators and directors. Because of this rigorous selection 'process', the Smithsonian adds to its collections only a tiny percentage of what it is offered." https://www.si.edu/FAQs

Surprisingly, after about five minutes into the heated discussion, Director Sajet when repeatedly challenged about her objection to the size of the painting, began to backtrack and eventually apologized for her ridiculous objection! This erratic behavior is evidence of a deliberate, intentional, hasty and partial personal opinion, one not based or grounded in Smithsonian Institution Standards! The sudden change of opinion about her first objection about the scale of the painting indicated that Director Sajet clearly knew, that her words and

[2] Please note since this suit was filed, this specific question and answer has been edited. Key words have been removed such as 'process', 'curators and directors'. Please visit link and see for your self.

actions were inconsistent with Smithsonian standards and procedures, since in the midst of her objecting, she dramatically made an 'about face' turn, demonstrating her opinion to be arbitrary, since the reality in the Smithsonian spoke to the contrary. This self-incriminating and guilty behavior at the outset of the conversation established the arbitrary context for the rest of the conversation, that later compelled plaintiff to investigate, and subsequently discover the reason for Director Sajet's change of mind. The evidence discovered, proves the initial objection was absolutely partial and biased against plaintiff and his Trump Portrait. Director Sajet was eager to rush to judgment and was eager to personally give plaintiff her biased objections. It is still to be discovered if Chief Curator Fortune agreed with the objection.

What was Director Sajet hiding? For an objection about the 'scale' of the painting from an institution whose mission is for the 'increase and diffusion of knowledge' again seems contrary. How can you get an 'increase' by limiting the size? An 'Increase' when applied to the pictorial arts would include the size of the art as a quantifiable factor when measuring 'increase'. It would be similar to objecting to a T---Rex skeleton as 'too big' or a giant golden nugget as 'too big' or Michael Angelo's statue of David as 'too big!' or the two huge 6 x 8 foot (93"x75") portraits of President Obama by photographer Chuck Close, that were loaned to the NPG to be shown in the Smithsonian National Portrait Gallery specifically for the 2013 'Inauguration Celebration' of then re--- elected President Obama! (Ex. CCC)

**LOANED PORTRAIT PRECEDENT FOR INAUGURATIONS/RIGHT OF PARTICIPATION**

At said inauguration two huge Obama Portraits were secured for the celebrations. From the Smithsonian website we read; "Diptych of President Barack Obama by Chuck Close. The

renowned artist Chuck Close created two photographs of Barack Obama and transferred them onto two large---scale (93---by---75---inch) jacquard tapestries. In conjunction with the Inauguration, this diptych has been loaned to the Smithsonian's National Portrait Gallery by Ian and Annette Cumming."(Italics & bold added) -celebrates-2013-presidential-inauguration-exhibits-and-programs (Ex. VVV)

Without knowing anything about the 2013 'Inauguration Celebration' at the NPG, plaintiff wrote this on December 7th, 2016, at the end of his appeal to the Board Of Regents upon his rejection by NPG Director Kim Sajet: "Please be considerate of the fact that January 20th, 2017 is fast approaching and it would be most fitting to pictorially and artistically celebrate and coincide with this historic inauguration of the 45th president Of The United States, President Elect Donald J. Trump, by having my portrait on display in the National Portrait Gallery." This was plaintiff's offer to 'loan' his portrait for the celebration of the Trump Inauguration. http://www.unafraid-and-unashamed.com/smithsonian-appeal.html

Since a clear 'Portrait lending' precedent for a Presidential Inauguration was established in 2013, a right of participation was created, a participation in inaugural celebrations for artist who have created portraits of soon to be inaugurated Presidents. These artists/collectors could of right apply to have their work shown for the inauguration. If there were multiple pieces offered, then a selection process would take place. But if there was only one painting offered, then by default that would automatically qualify as the loaned presidential portrait.

'TOO BIG' plaintiff was told, and it turns out that the 'loaned' diptych art work measured nearly 105 square feet of occupied wall space including the gap in between the two huge Obama portraits. Without the decorative frame, the Trump Portrait measures just shy of

105 square feet, nearly exactly the same size! (Ex. EEE)

The spirit of the Smithson Will, that of 'increase' in the Smithsonian Institution at its founding regarding 'scale' contradicts this arbitrary opinion and can be seen in the Smithsonian Act;

"SEC. 5. *And be it further enacted*, That, so soon as the board of regents shall have selected the said site, they shall cause to be erected a suitable building, of plain and durable materials and structure, without unnecessary ornament, and of ***sufficient size***, and with suitable rooms or halls, ***for the reception*** and ***arrangement***, ***upon a liberal scale***, of objects of natural history, including a geological and mineralogical cabinet; also a chemical laboratory, a library, a ***gallery of art***,..." Smithsonian Act of Congress, 1846

**5th Amendment 'Due process of law' violation.**

**"NOT FROM LIFE"**

Director Sajet continued, saying the Trump portrait was disqualified from consideration since it was not created from life, partially citing a Smithsonian Standard for portraiture acceptance. At this point Mr. Raven was in disbelief. Plaintiff immediately cited the Smithsonian reception and showing of the Shepherd Fairey Obama 'Poster' on January 13th, 2009. Plaintiff being intimately acquainted with the story of its creation, appealed to the poster as evidence that the NPG surely did show work not taken from life. At this point, since the Director's second objection was now questioned, the Director repeatedly insisted that the Shepherd Fairey political campaign poster, had in fact been created from a live sitting by the artist with then Candidate Barrack Obama! This is absolutely false!

The Director did not back down on this statement, thus clearly violating federal law regarding the making of false statements by federal employees and the General Principles of Ethical Conduct for Federal Employees.

**5th Amendment 'Due Process of Law'**

98. This was where the NPG Director twisted the truth to support her bias in favor of the Obama poster and obviously Barack Obama. One only has to examine the criminal conviction of the artist in question regarding the 'Hope' poster, Shepherd Fairey to discover that the 'Hope' poster was a digitized photograph taken from the internet from AP photographer Mannie Friedman. It turns out that the 'requirement from life' rule Director Sajet cited was partially true, the Smithsonian standard did require portraits to be from life. But as with this entire story, the guideline was quoted partially since it says; "that works must be the best likeness possible; original portraits from life, *if possible*;" http://siarchives.si.edu/history/national-portrait-gallery

In actuality, out of the four Donald Trump 'portraits' the NPG owns, only one of the four was actually created from life. In reality out that one of the four 'portraits' is actually a cartoon sketch of Donald Trump! Either Director Sajet was unaware of the existing stock of the Donald Trump portraits in her possession and of their back story regarding originality from life or she deliberately obscured the truth and fabricated the argument in her repeated efforts to deny plaintiff entry into the application process? Federal Employees And Smithsonian Employees are ordered by law to be 'Loyal To the Constitution', 'Honest', 'impartial' etc. in their decisions and conduct.

**"TOO PRO-TRUMP" VIEWPOINT DISCRIMINATION**

"For the reasons given by the Court, I agree that the Free Speech Clause of the First Amendment forbids what respondents have done here."

**Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist. (91---2024), 508 U.S**

Director Sajet now moved to her next partial and biased objection. The Trump Portrait was too 'PRO-TRUMP'! 'It is not neutral enough' Director Sajet continued. Not only are Smithsonian Employees to be impartial, they are to follow the clearly established 'standards' for judging or testing a work of art. The 'Hope' Poster, created for Barrack Obama's political campaign in 2008 is nothing but 'PRO-OBAMA'. The whole essence of the Obama poster was to portray Presidential candidate Barrack Obama in the most favorable political light, as a visionary leader gazing upwards! What would be the point if it was not 'PRO-OBAMA'? Again clear and blatant bias and partiality is demonstrated in this arbitrary objection. https://www.si.edu/content/OGC/SD103.pdf https://www.justice.gov/ncfs/file/761076/download

In the 2013 'Celebration' Inauguration of President Obama, the NPG hung TWO huge 6x8 foot photo portraits of President Obama side by side along with the 'Hope' poster from 2008 a total of 3 'PRO' Obama portraits no less! And I am told that one portrait of Donald Trump is 'TOO PRO TRUMP'? This is obviously another false, biased and partial statement!

**Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist. (91---2024), 508 U.S 18 U.S. Code §**

**1st Amendment Political free speech violation Viewpoint Discrimination**

**5th Amendment 'Due process' and 'Equal protection' Discrimination**

**"TOO POLITICAL"- VIEWPOINT DISCRIMINATION**

"For the reasons given by the Court, I agree that the Free Speech Clause of the First Amendment forbids what respondents have done here." Justice Scalia

**Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist. (91---2024), 508 U.S**

The Director of the *National* Portrait Gallery from the outset of the phone call mentioned, in a condescending tone the imagery of the eagle and the American flag. Director Sajet's tone implied the painting was too patriotic. Whilst complaining that the trump Painting was not 'neutral enough' the Director repeatedly mentioned the George Washington Lansdowne portrait in the NPG since it too had a fully developed background. Furthermore, the Lansdowne portrait is layered in symbolism like the Trump Portrait, the Lansdowne portrait is not just a portrait of the face of the subject. Director Sajet excused the Washington portrait whilst objecting to the Trump portrait since the Washington portrait contradicted her objection to the Trump portrait's content. An analysis of the Washington portrait reveals a much large ratio of background and body to the shoulders, head and face than is contained in the Trump Portrait that is about 40% head and face. An analysis of the Trump cartoon sketch, part of the 4 portraits owned by the NPG also reveals another contradiction to the Directors objections as to the ratio of background verses head, face and shoulders.

Again, to be noted, Director Sajet's opinion was devoid of Smithsonian Institution standards. The Director said the Trump Portrait was in fact 'TOO POLITICAL'! Again to plaintiff's

astonishment, the NPG Director had now objected to the historical context, the political and presidential campaign of 2015-16, the unprecedented campaign of Donald J. Trump and to the content of the Trump Portrait. The American Flag, the Bald Eagle, the representation of the geographical United States and The Statue of Liberty are some of the American symbols used in the contextual narrative of the Trump Portrait and these are too political to be shown in the *National* Portrait Gallery? They are patriotic rather than political. The title 'Unafraid And Unashamed' is relating to Trump's character politician or not!

**ELECTION-RELATED POLITICAL ART ACCEPTANCE PRECEDENT ESTABLISHED IN A LIMITED PUBLIC FORUM**

Objecting on political grounds to the content of the Trump Painting, as being 'too political' is an objection by a Federal Government employee and senior Director of a Federal Institution to political speech that the Director deems 'politically incorrect' or unacceptable. If the NPG had an official standard forbidding all political content, portraits and political campaign posters etc. that could be reason to reject the painting. But by allowing, accepting, celebrating and showing the political Obama 'HOPE' poster in 2009, 2013 and by accepting the 2008 Hillary Clinton political campaign poster, the National Portrait Gallery created a legally binding political campaign art precedent and display 'right' for all political speech in a limited public forum. If the government gallery allows some political art from certain viewpoints it must allow all political art from all political viewpoints or none at all. The government cannot discriminate!

By accepting the political art from Democratic Washington 'super lobbyists' who said on Jan. 7th 2009 "It seemed like a historic moment for the country, and a chance to do

something for art and Democrats," Tony Podesta, brother of transition co---chairman John Podesta" when discussing donating the 'Hope' poster to the National Portrait Gallery. And since the political art was created by confessed 'hard core left wing activists' for a presidential political campaign about a Democrat left wing activist political presidential candidate and then President Elect Obama, a clear political campaign art precedent was established! http://voices.washingtonpost.com/reliable---source/2009/01/rs---portrait7.html

The NPG made it clear it accepted art/gifts/political beliefs/speech from Democrat left wing activists. The Obama poster is a highly political work of art, it even contains a campaign slogan 'HOPE' used for campaigning for Presidential Candidate Barrack Obama as the candidate of the people's 'hope'.

By rejecting the Trump Painting as 'too political' the NPG Director Kim Sajet has censored and deprived plaintiffs 1st Amendment rights of political free speech in a limited public forum for the people and by the people, where political artistic pictorial speech is clearly accepted, promoted and celebrated. As an artist, politically conservative, right wing political activist and member of the Republican party plaintiff's rights have been clearly violated and said Director has issued another false statement! http://npg.si.edu/object/npg_NPG.2008.52 (Obama poster at the NPG)

"In his 58-page decision, (District Judge Royce C.*added*) Lamberth "lauds the District for opening its lampposts to political messages" but writes that "once the District opens up public property to political speech, it has a responsibility **to be fair, even and precise** in its regulations." https://www.washingtonpost.com/local/dc-news/judge-finds-districts-rules-

for-hanging-political-posters-unconstitutional/2012/11/29/c4b8942e-3a60-11e2-b01f-5f55b193f58f_story.html?utm_term=.67bde0bb70c9

"To comply with the First Amendment, a government regulation in a public forum must meet three criteria. **It must be content-neutral**; it must be narrowly tailored to serve a significant government interest; and it must leave open ample alternatives for communication. **Burson v. Freeman, 504 U.S. 191, 197 (1992) (citing United States v. Grace, 461 U.S. 171, 177 (1983))."**

**First Amendment To The Constitution Of The United States 'Congress shall make no law… abridging the freedom of speech…'**

**5th Amendment to the Constitution of the United States ' Due process of law' clause, 'equal protection' discrimination.**

"For the reasons given by the Court, I agree that the Free Speech Clause of the First Amendment forbids what respondents have done here." Justice Scalia

**Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist. (91---2024), 508 U.S**

"Invariably, the Court has felt obliged to condemn systems in which the exercise of such authority was not bounded by precise and clear standards.*(Smithsonian NPG standards are clear…**added**)* The reasoning has been, simply, that the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use. Our distaste for censorship -- reflecting the natural distaste of a free people -- is deep-written in our law."

**SOUTHEASTERN PROMOTIONS, LTD. v. CONRAD ET AL. 420 U.S. 546**

**"NO GOOD"**

After Director Sajet's objections were all refuted, her final and seemingly desperate, personal and arbitrary opinion was that she did 'not like' the portrait and the Director said that it was 'no good', again showing her personal bias against plaintiff and his painting. Again ignoring the Smithsonian Standard; "Thus, the standards for accepting portraits varied considerably from other galleries. Even today, in every instance, the historical significance of the subject is judged before the artistic merit of the portrait, or the prominence of the artist." But regardless of what the Smithsonian has to say, Director Sajet was to have the last word and that was final! http://siarchives.si.edu/history/national---portrait---gallery

**ACTING UNDER COLOR OF LAW**

Based upon Director Sajet's final taunting words to the plaintiff this legal complaint has been made. The final words were something like this. 'I am the Director of the National Portrait Gallery, this application will not go forward or even be considered, you can appeal my decision all you want…'

"Write down exactly what was said to you by the offender, taunt reveals motive" according to the Bakersfield Police Department on their Hate Crimes brochure. http://www.bakersfieldcity.us/civicax/filebank/blobdload.aspx?BlobID=29731

It is clear that this type of authoritarian statement evinces an abuse of authority, in that all procedural 'due process' was stripped away from plaintiff Raven, from the Smithsonian Institution and from the Smithsonian Trust Beneficiaries, the American People. Plaintiff

was deprived of his constitutional right of free political speech while others of a different opinion were permitted. Plaintiff's rights were willfully & recklessly ignored, cancelled, trampled and violated! Everything the Smithsonian Institution stands for, the 'increase and diffusion of knowledge for all men', the Smithsonian Board of Regents approved standards for acceptance of portraiture, the rights of participation, the rights of procedural 'due process' that is plaintiff's right to participate in the process of consideration were thrown out of consideration.

Telling plaintiff that the work is 'no good', when that opinion is based on a tiny image on a computer screen and not an examination of the original, is a partial, personal opinion and a false statement in the context of the Smithsonian Standards of acceptance since artistic merit is not a criterion for acceptance at the NPG. http://siarchives.si.edu/history/national---portrait-gallery

This can be seen by the Trump Cartoon 'Portrait' which is part of the NPG portrait collection! http://www.unafraid---and---unashamed.com/smithsonian---trump---portraits.html

**5th Amendment 'Due process of law…'**

**DEPRIVATION OF RIGHTS OF PARTICIPATION & APPLICATION 'PROCESS'**

Once Congress appointed Co-Trustees, the Board Of Regents, it created 'standards' or 'guidelines' for acceptance of portraits at the Smithsonian National Portrait Gallery. The Smithsonian Trustees created certain 'rights' of participation for Trust Beneficiaries and for

Citizen Participation. Those standards gave the right to any Beneficiary of the Will of James Smithson and thus any United States Citizen to participate in the gallery so long as they met those standards.

504 F. Supp. 1365 (D.D.C. 1981)

http://siarchives.si.edu/sites/default/files/pdfs/9_Stat_102.pdf Section 11 (Individual Right) Smithsonian Institution FAQ from SI website: "The Smithsonian acquires thousands of objects and specimens each year for its collection holdings through donation, bequest, purchase, exchange, and field collecting. The Institution accepts only items that truly fill a gap in the collections and then only after careful consideration by museum curators and directors. Because of this rigorous selection 'process', the Smithsonian adds to its collections only a tiny percentage of what it is offered." https://www.si.edu/FAQs The 1963 commission clearly said "Thus, the standards for accepting portraits varied considerably from other galleries." http://siarchives.si.edu/history/national---portrait -gallery Please see The Smithsonian NPG Bias Chart for a list of standards. http://www.unafraid-and-unashamed.com/smithsonian-bias-chart.html

By ignoring those 'standards' Director Sajet has become judge, jury and executioner using her own personal and biased anti-Trump opinion for rejection or acceptance. As a Trustee Delegate, 'Functional Fiduciary', Director Sajet has violated all of the duties of Fiduciary responsibility under the vast panoply of laws that govern the business & behavior of Trusts, Trustees and their Delegates. As an employee of the Federal Government Director Sajet has trampled plaintiff's rights as beneficiary of the Will Of James Smithson and a U.S. Citizen according to the 5th Amendment 'Due process of law' clause and violated the Federal and Smithsonian standards of Ethical Conduct.

**WRONGFUL EXCLUSION**

In NAACP LEGAL DEFENSE, ETC. V. CAMPBELL (1981) United States District Court, D. Columbia. 504 F. Supp. 1365 (D.D.C. 1981) Gesell, District Judge a clearly settled legal case establishes plaintiff's claims to 'wrongful exclusion' as authoritative. Opinion by District Judge Gesell clearly establishes the merits of this case since in said case(504F.), plaintiffs were excluded because of a faulty interpretation of 'vague' standards of participation in a Government established program.

In this case, plaintiff Raven is not arguing against the vague interpretation of a statute, but against the complete violation and ignoring of the Smithsonian Institution's statutes of participation. Statutes in plaintiff Raven's case are clear and not in the slightest bit vague. Since plaintiffs in said case (504 F.) prevailed in the District Court in the District of Columbia in their case(504 F.) for a vague interpretation of a single statue, how much more should plaintiff in this case?

Case (504 F.) marvelously parallels plaintiff Raven's claims in many ways in the principles of the argument, the rights of participation, the conditions for participation, arbitrary decisions, the 1st and 5th Amendment violations. Also the burden upon government behavior according to the 5th Amendment 'Due process of law' clause and for the remedies to rectify and review said case when such violations occur and the final judgment; a. "Procedures and requirements for the Campaign are set forth in the Manual on Fund… Eligibility is determined by officials of the Office of Personnel Management, successor to the Civil Service Commission, in accordance with the standards set forth in the Manual."; b. "It behooves the

government officials responsible for the program to re-examine the basic premises on which the program was established" c. "the Court finds that defendant's rejection of plaintiffs' applications to the CFC, based solely on a failure to satisfy the "direct services" requirement of section 5.21 of the Manual, must be set aside pursuant to this Court's review of the Agency Procedure Act"(Although the APA does not apply to the Smithsonian, the principles of the judicial decision apply with the 5th Amendment 'Due process of law' clause. as the basis. *added*.) "Defendant shall not reject any pending or future application of plaintiffs on this ground." Judge Gesell, U.S. District Court in the District of Columbia.

Upon further research of the multiple, clearly established, congressionally appointed, Board Of Regents approved established principles/criteria of acceptance of 'art' into the Smithsonian NPG both in the 'Programme Of Organization' from 1847 and in the standards set by the 1962/62 Congressionally appointed Board of Regents appointed commission for the creation of the National Portrait Gallery, plaintiff was further disturbed by the undocumented and personal call he had received from Director Sajet.

Plaintiff had presented a publically supported, 20 plus page written application to the NPG. Mr. Raven's application would be cast aside by one bizarre eleven minute, anti---Trump, arbitrary, unfounded and personally opinionated phone call by the NPG Director Kim Sajet. The phone call had more in common with a private art gallery than a National Public Trust belonging to the people of the United States, 60 PLUS MILLION of whom voted for Donald J. Trump! Arbitrary personal tastes and bias are the norm in the subjective art world. They should not be part of the Smithsonian National Portrait Gallery that should and always be impartial. The 1963 commission clearly said "Thus, the standards for accepting portraits varied considerably from other galleries." http://siarchives.si.edu/history/national---

portrait---gallery

The refusal to show the fine art, hand painted Trump Portrait 'Unafraid And Unashamed' in lieu of the dated 1989 photo of Apple tossing Trump photo was a deliberate slight to create 'zero' interest in visiting the National Portrait Gallery! Who would go out of their way to see that? Art has the power to create conversation and speak on levels where ordinary dialogue fails. Such dialogue was deprived from the People!

Director Sajet's final words to the plaintiff were; 'I am the Director of the National Portrait Gallery, this application will go no further, you can appeal my decision all you want!

**DR. RICHARD KURIN'S ACTIONS IN VIOLATION OF THE 5TH AMENDMENT 'DUE PROCESS OF LAW' AND 'EQUAL PROTECTION' CLAUSE.**

Mr./Dr. Richard Kurin is a 'Covered Executive' at the Smithsonian Institution. Mr. Kurin was clearly briefed on his legal responsibilities under Federal Law, Federal Statutes of Ethical Conduct by the Smithsonian Office Of General Counsel at the outset of the Director's tenure at the Smithsonian Institution.

""Covered Executives," for purposes of this directive, includes but is not limited to the Secretary of the Smithsonian, all direct reports to the Secretary, and all Unit Directors with

broad decision-making authority within the Institution. All individuals whose positions are designated as Covered Executive are notified of such at the time they either receive their offer of employment or transfer to a new position within the Smithsonian that is designated as a Covered Executive. All Covered Executives **must contact the General Counsel** to be briefed **on their responsibilities under these Standards of Conduct** within thirty (30) days of hire or assumption of a Covered Executive position. A list of current Covered Executives is updated annually and available on the OGC Prism website." Smithsonian Standards of Conduct https://www.si.edu/content/ogc/sd103.pdf

Mr. Kurin was also specifically directed by the Smithsonian Institution to be self informed and thus personally responsible, thus personally liable in the areas of applicable Federal law so as to avoid prosecution under Federal law. Legal counselors are available to give advice about how the Director's 'planned' conduct may have violated Federal law. If Mr. Kurin had of followed procedure, Mr. Kurin would have consulted with the legal counselors as to his planned response, opinions and actions contained in his 'letter' in response to plaintiff's appeal. Since it is obvious Mr. Kurin did not, then the he ignored Smithsonian legal procedural directives specifically relating to Federal law issues and acted independently, willfully, deliberately, intentionally, recklessly with complete disregard to the procedural 'due process of law' at the National Portrait Gallery and under the 5th Amendment to the Constitution of the United States of America. "No person shall be deprived of …liberty and property without the due process of law".

"Apart from disciplinary or remedial action by the Smithsonian arising from a violation of these standards, civil and criminal penalties may be imposed for violation of federal statutes, to the extent that such statutes are applicable to federal or trust fund employees. **It**

**is the responsibility of Smithsonian employees to be aware of applicable statutes and to *ensure* that their conduct does not violate federal laws…"** Ethics Counselors are available to advise employees about how their conduct, or planned activities, might violate federal statutes." Smithsonian Institution Standards of Conduct https://www.si.edu/content/ogc/sd103.pdf

Thus, Mr. Kurin acted with full knowledge of the law, which is evidenced by Mr. Kurin's deliberate and willful exclusion of the word 'appeal' in his written response. Mr. Kurin ignored and disobeyed specific Smithsonian Institution directives to be educated, informed and personally responsible concerning such matters and if and when in doubt, to seek legal counsel 'before' taking action. And remember this claim is against the Smithsonian Acting Provost of a National Institution who had been appointed by the Board of Regents to attend to the appeal. Discovery must take place to determine the specificity of the directive Mr. Kurin received from the Board of Regents.

**Smithsonian Employee Duty**

"The Smithsonian Institution is a **public trust** whose mission is the increase and diffusion of knowledge …the **<u>fiduciary responsibility</u>** …**We are accountable to the general public… We recognize that the public interest is paramount…** maintain the **highest standards of honesty, integrity, professionalism, and loyalty to the Institution… take care to avoid** conduct… compromise the integrity of or **public confidence… preserve the public trust… an expectation of ethical and professional conduct** in **all** of our activities… **apply to the Institution collectively and to all members… includes Regents**, **staff… must be mindful** that it **is a public trust…** on 2 **behalf of the American public…**

marked by **openness… robust communication… Effective transparency… Each member…** with **honesty, integrity, openness, accountability…** that values **respect, fairness**, and **integrity**… **responsible** for being **aware of and complying… All Smithsonian activities…** compliance with **applicable laws**, **regulations**, and international conventions… **<u>All</u>** Smithsonian activities **will be conducted in accordance** with **established policies**, **directives, and procedures…** compliance **with legal** and **ethical requirements…. high standard of ethics and accountability…. ensure compliance… consistency…. are established, disseminated, kept current, and consistently applied at all levels** of the organization… **<u>the highest public trust…</u> prudent and responsible… <u>documentation….</u>** ensures **that legal requirements** are observed and **<u>compliance is documented…</u> that accuracy and intellectual integrity…**We acknowledge and **address diverse values**, **opinions,… consistently applied…** The **Smithsonian values and promotes inclusiveness** and **diversity in all** of its activities… **<u>and points of view….</u>**."

Smithsonian Statement of Values and Code of Ethics, 2007

Any claims of ignorance, by Mr. Kurin are a confession by one whose actions indicate Mr. Kurin thinks and acts as if he is above the law, and whose actions demonstrate a willful disobedience, willful ignorance, willful failure to follow established protocols and procedures, irresponsibility, negligence and the dereliction of duty.

If officials at the highest echelons of decision making power in our federal government institutions can act with such reckless disregard to federally guaranteed constitutional rights, institutional law and procedure, then it is the right, it is the obligation of the citizen victim in this case, to right these usurpations and deprivations by invoking the power of the Courts!

137. Any actions conducted under these conditions are nothing but a reckless disregard for the will of James Smithson "…an institution for the increase and diffusion of knowledge among men.", the Smithsonian Act of Congress of 1846, the 'Programme Of Organization' and the most recent 2007 Smithsonian 'Statement of Values and Code of Ethics' and the 1st and 5th Amendments to the United States Constitution.

Please remember this all was happening during, relating to, in the context of, and prior to the inauguration of the President of the United States of America, then President Elect Donald J. Trump. The gravity and reverence of the occasion, the historicity of the occasion, the significance of the unprecedented Presidential election campaign, the unprecedented win and the National significance all seem to have been of no import or significance to federal employees of the National Portrait Gallery and Smithsonian Institution, when considering the egregious deprivations and violations that were alleged to have taken place.

In Dr. Kurin's letter to plaintiff, he now assumed the role of spokesperson for the Board of Regents, even though he was not mentioned in the appeal. He says he was appointed by the Board of Regents. At the outset of the letter Mr. Kurin writes, "We appreciate receiving your letter dated December 7th…". The only letter sent to the Board of Regents by plaintiff on December 7th, was plaintiff's 5 page letter of 'appeal'. No where in Mr. Kurin's letter does he acknowledge that the letter was an appeal, when that is the very essence and purpose of the letter.

Mr. Kurin treated the letter of 'appeal' as another letter of application and yet it clearly was not. It was an appeal based upon the arbitrary rejection and ensuing remedial directions from the Director of the National Portrait Gallery, Kim Sajet. It is outrageous that Mr. Kurin,

would dismiss plaintiff's 5th Amendment protected appeal by completely ignoring plaintiff's appeals for justice considering he is, "…the Smithsonian Distinguished Scholar and Ambassador-at-Large, the first person so designated in the 171-year history of the Institution. As a member of the Smithsonian's senior leadership team, Kurin focuses on strategic direction, institutional partnerships, public representation, philanthropic support and special initiatives. Prior to his current role, Kurin served as Acting Provost and Under Secretary for Museums and Research from 2015, and from 2007, as Under Secretary for History, Art, and Culture…." http://newsdesk.si.edu/about/bios/richard-kurin

In his letter Dr. Kurin, once he had edited and deleted plaintiff's rights to appeal out of the letter of appeal, again cited another arbitrary reason for the refusal. Dr. Kurin now appealed to a 'recent tradition' and 'a long planned event' as a sufficient basis for the rejection. Dr. Kurin claimed the 'long planned' event, (remember this was only 4 weeks after Mr. Trump won the election, so 'long planned' is already suspect unless they had counted on a Clinton win?) which strangely had not come to light until after the media began to be aware of the rejection of the Trump Portrait application. If it was so 'long planned' and obviously such a special event how come it only came to light after the Trump Portrait application issue became public knowledge? And finally what would prevent the National Portrait Gallery showing a second Trump Portrait for the inauguration festivities since they showed 3 portraits for President Obama in 2013! (Discovery is required to uncover the unknown steps that took place to get plaintiff's case to this point.)

Appealing to 'recent tradition' as a legitimate objection is a classical logical fallacy, evasively arbitrary and a violation of clearly established Smithsonian Standards and practices by one of the most 'educated' official authorities at the Smithsonian Institution. An 'appeal to

tradition' by Dr. Kurin again circumnavigated the standards established by the Congress appointed Co-Trustees, the Board Of Regents, the ratified 'Programme Of Organization' by Joseph Henry for portraiture acceptance. Dr. Kurin claimed that this so called 'recent tradition' superseded the 5th Amendment 'Due Process of law', the Smithsonian established Statement of Values and Code of Ethics, was binding and rigid forbidding the showing of any other work of art for such an historic event such as the inauguration of President Elect Donald J. Trump or even submitting the work for application for future showing. Dr. Kurin claimed that the Smithsonian's so called 'long planned' event with a selection of art from its archives (1989 in this case) superseded the precedent established on January 17th, 2009 and in 2013 of showing of a 'politically' relevant and contemporary work of art related to the historic win of Barack Obama.

Dr. Kurin concluded his letter by saying he had spoken with Dir. Kim Sajet and 'concurred' with her decision. Again the Smithsonian officials now agree together in a 'concurrence' with the arbitrary, personal and unfounded objections of Dir. Kim Sajet. Nowhere is there any documentation to show what that decision consisted of, just a personal undocumented phone call!

Clearly Dr. Richard Kurin has embraced the unlawful actions of Director Sajet and by 'concurrence' made himself accountable and jointly liable for her actions as if they were his own. Dr. Kurin has incriminated himself by willful agreement with the unlawful actions of Director Kim Sajet.

Dr. Kurin again further incriminated the procedural failures in this case by admitting to speaking with Director Sajet and 'concurring' with her decision whilst failing to say what

that 'decision' consisted of for the record. Dr. Kurin had the perfect opportunity to shed light on this situation and demonstrate through agency procedure where plaintiff's art had missed the mark. But instead he incriminated himself, failed to declare at record the contents of his discussion with Director Sajet.

What Dr. Kurin does accomplish though is a vindication of plaintiff's claims since he confirmed the conversation with plaintiff took place and its negative outcome, the rejection of the Trump Portrait for the inauguration of President Elect Trump. Dr. Kurin's letter did not cite legitimate procedural reason and standards for the rejection of the Trump Painting and so in the absence of those, once can reasonable conclude that his 'concurrence' is with the unlawful actions and decision of Director Kim Sajet.

It is outrageous that within all of the actions of Mrs. Sajet, An Appeal to the Board of Regents and an official response by Dr. Kurin, any notion of the 'Due process of law', all notion of an adherence to official Smithsonian procedures, rules, standards, official policies is completely lacking. The actions of Dr. Kurin can only be described as arbitrary, manipulative, deceptive, reckless and unreasonable. Any reasonable person would conclude that, at the very least, 'minimum due process' was required, and especially since this is a government instrumentality.

In **Cleveland Board of Education v Loudermill (1985),** the Supreme Court ruled that '…The minimum due process due is determined as a matter of federal constitutional law, not state law.", "…If a clearer holding is needed, we provide it today. The point is straightforward: **the Due Process Clause provides that certain substantive rights - life, liberty, and property - cannot be deprived except pursuant to constitutionally**

**adequate procedures**. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty. **The right to due process "is conferred, not by legislative grace, but by constitutional guarantee**. While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards."”

“…An essential principle of due process is that a deprivation of life, liberty, or property "be **preceded by notice and opportunity for hearing appropriate to the nature of the case**." We have described "**the root requirement**" of the Due Process Clause as being "**that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.**" This principle requires "**some kind of a hearing**" prior to the discharge of an employee who has a constitutionally protected property interest in his employment. **Even decisions finding no constitutional violation** in termination procedures have relied on the existence of some pre-termination opportunity to respond…” **CLEVELAND BOARD OF EDUCATION v. LOUDERMILL, 470 U.S. 532 (1985)Supra**

“**The first step in the balancing process mandated by Eldridge is identification of the nature and weight of the private interest affected by the official action challenged**. Here, the private interest affected is the granted license to operate a motor vehicle. More particularly, the driver's interest is in continued possession and use of his license pending the outcome of the hearing due him. That interest is a substantial one, for the Commonwealth will not be able to make a driver whole for any personal inconvenience and economic hardship suffered by reason of any delay in redressing an erroneous suspension

through post suspension review procedures.... **The duration of any potentially wrongful deprivation of a property interest is an important factor in assessing the impact of official action on the private interest involved....**" **U.S. Supreme Court MACKEY v. MONTRYM, 443 U.S. 1 (1979)**

In the IRC Report about the Smithsonian Institution about the systemic corruption at the Smithsonian, the culture of secrecy is one of the lawless cultures exposed at the Smithsonian Institution. This evasive behavior by Dr. Kurin as to the content of the conversation with Director Sajet to which he concurs, evinces the claim of secrecy as still alive today. https://www.si.edu/content/governance/pdf/IRC_report.pdf

Plaintiff's 4 page written response and objection to Dr. Kurin's letter that responded to Dr. Kurin's arbitrary statements and decision, also requested information, but the letter was never answered. At this point plaintiff had exhausted all efforts to find a deprivations remedy within the Smithsonian Institution.

**Dr. Kurin's actions constitute constitutional 5th Amendment deprivations in three ways.**

**1. The dereliction of duty regarding plaintiff's constitutional right to an 'appeal' which Dr. Kurin was appointed by the Board of Regents to adjudicate.**

**2. The 'concurrence' with Director Sajet's unlawful decision and actions and the refusal to either declare in writing what that was and the refusal to cite Smithsonian standards, procedures and or rules justifying his position concerning plaintiff's application.**

**3. The complete refusal to extend procedural 'due process of law', instead Dr. Kurin employed arbitrary, personal, un-documented and secret opinions to politely slam**

**the door of the Smithsonian Institution in plaintiff's face!**

**5th Amendment to the United States Constitution, 'liberty & property', 'due process' and 'equal protection' deprivations.**

It appears that in order to have artwork accepted 'on loan' at the Smithsonian Institution, you need to give a $716,000.00 dollar donation, be a member of a board and bear the name Cosby. For Mr. and Mrs. Bill Cosby could loan their Art collection and have it shown even when Mr. Cosby was and continues to be under federal investigation for his alleged sexual crimes and that was justified and accepted by Dr. Kurin!

https://news.artnet.com/art-world/smithsonian-concealed-bill-cosby-donation- 316275
https://www.washingtonpost.com/news/arts-and-entertainment/wp/2015/07/15/african-art-museum-director-in-difficult-place-with-bill-cosby-allegations/?utm_term=.f7f6512b0 5cf

**CONCLUSION**

There is no doubt that the Smithsonian Institution's founding vision and charter were both noble and generous. The spirit of the institution was built upon broad and curious ideas of great inquiry and learning in the pursuit of truth. As a result, because of the enormous bequest of Mr. James Smithson, funds were available since the beginning, to give this vision its means to reach for the stars in any and every field of learning it should pursue. One must acknowledge with great respect that which the Smithsonian Trust has achieved and accomplished along with the great good and tangible benefits to millions of its beneficiaries for over a century!

Sadly, history testifies to the nature and influence of corruption to which all institutions eventually succumb. Institutions under the leadership of its leaders, its officers and its trustees can begin to drift from its founding values and before long institute their own ideas and values and eventually the conduct of the Institution becomes completely removed from its founding ideals and values.

IRC REPORT https://www.si.edu/content/governance/pdf/IRC_report.pdf

Secretary Joseph Henry, the pioneering, brilliant and tireless servant of the newborn Smithsonian Institution bore the responsibility of defining the founding charter. He plotted the course of the Institution in the 'Programme Of Organization' once Congress had finally acted in 1846. Mr. Henry's grasp of the nature of the Will of Smithson was pure and uncluttered by any agenda other than that of the testator. The Board of Regents adopted the charter on December the 13th, 1847

Secretary Henry wrote thus in articles 4-7 of the 'Programme Of Organization';

"The objects of the institution are, 1st, to increase, and 2nd to diffuse knowledge among men.

These two objects should not be confounded with one another. The first is to increase the existing stock by the addition of new truths; and the second, to disseminate knowledge, thus increased, among men.

The Will makes no restriction in favor of any particular kind of knowledge, hence all branches are entitled to a fair share of attention.

Knowledge can be increased by different methods of facilitating and promoting the

discovery of new truths; and can be most efficiently diffused among men by means of the press.

Sadly as plaintiff's case clearly exemplifies, we see a different spirit has over taken the Smithsonian Institution. The actions of its officers in plaintiff's case evince a willful effort to exclude 'new truths' and forbid the 'increase (of any) knowledge' they despise. The egregious actions of Director Sajet et al, clearly demonstrate hostility to the Will Of James Smithson and to the founding charter, the 'Programme Of Organization'!

They have unapologetically shown their cooperative efforts, which may turn out to be conspiratorial under discovery, to deprive the Institution and thus its Beneficiaries, the American People of an 'increase in the existing stock by the addition of new truths' by refusing a work of art about the now President Of the United States because they are hostile personally, ideologically and politically against President Donald J. Trump.

Director Sajet, who is meant to be an impartial Trustee Delegate Officer and an impartial Federal Employee, even uses her official Smithsonian National Portrait Director's Twitter account to reveal her political bias. On the 20th of January 2017, rather than show the dated apple tossing Trump Portrait that she hung in the NPG in 'celebration' of the inauguration of President Elect Trump, she re---tweets a New York Time's article about the darkness and fear in Washington related to the inauguration of President Trump! Again rather than be impartial and invite people to the NPG to 'celebrate' the inauguration of Donald J. Trump, she posts a photo of herself marching the next day at the 'March for Women' against President Trump! Without any positive tweets about the 'Trump Photo' she hung for the inauguration, it is obvious by exclusion what the NPG Director is saying and it corroborates

all of the claims made by Artist, Trump Grassroots Activist and plaintiff Julian Marcus Raven.

Plaintiff Raven will show by a preponderance of evidence that the Smithsonian Institution has a long track record of viewpoint discrimination and bias against ideas and beliefs which are determined to be forbidden and which mainly fall under the categories of Conservative, Republican and Christian ideas and viewpoints. That this systemic, unlawful culture at the Smithsonian Institution is the context in which the actions of Defendants Director Sajet, Chief Curator Brandon Brame Fortune, Dr. Richard Kurin and Linda St. Thomas acted. Their actions are in harmony with this pervasive lawless culture at the Smithsonian Institution and thus their actions are demonstrated to be as claimed! This case is sadly not a surprise!

**WHEREFORE.** Plaintiff Julian Marcus Raven demands relief, judgment, compensatory and punitive damages against Defendants as follows:

That the Court exercise its discretionary powers over the Smithsonian Trust, its Trustees and their Delegate Officers and suspend, vacate and reverse the decision made by Director Sajet & Dr. Kurin regarding the rejection of the Trump Painting and order the Trump Portrait 'Unafraid And Unashamed' be considered according to Smithsonian Trust standards and procedure.

That the Court grant discovery in order to make an immediate 'accounting' or review of the actions, secret conversations and decisions of Director Sajet, Dr. Richard Kurin, Chief Curator Brandon Brame Fortune and Linda St. Thomas.

That the Court exercise its discretionary powers over the Government Trust and order full compliance according to the all relevant Smithsonian Institution rules and procedures related to this case, to be officially fulfilled and documented for public record which includes the re-consideration of Mr. Raven's application.

## COMPENSATORY DAMAGES

"If public officers will infringe men's rights, they ought to pay greater damages than other men, to deter and hinder other officers from the like offences."

***Ashby v White*** (1703) 92 ER 126

That Compensatory Damages be paid to the plaintiff for 'View Point Discrimination' in the amount of $110,000.00 against defendants Mrs. Sajet and Mr. Kurin in their individual capacities. In Case number BC 423687, the California Science Center settled suit with the American Freedom Alliance for $110,000.00 after breaching contract under pressure from the Smithsonian Institution to cancel the showing of 'Darwin's Dilemma' a film from the perspective of Intelligent Design. This was a clear case of viewpoint discrimination!

That $100,000.00 be paid to plaintiff for emotional distress by the defendants in their individual capacities as a result of the egregious conduct of the Smithsonian NPG Director Kim Sajet and Dr. Kurin.

1. Arbitrary opinions, constitution violating actions and negligent inactions have deeply affected Artist Julian Raven's personal and family life, conversation, disposition and focus. Artists are highly sensitive, perceptive and vulnerable people when dealing with the deepest and most sacred creative expressions of their inner most being.  In this case the

most important work of art in Artist Julian Raven's career.

2. The initial 'shock' which left Mr. Raven in a fog, as a result of the stunning and arbitrary phone call lasted 2 days, during which time Mr. Raven was unable even to speak about the conversation due to the shocking treatment or even share what had happened with his wife. Artist Julian Raven was silent and walked around in a daze.

3. Since December the 1st, 2016, this injustice has completely interfered in plaintiff's thinking, routine, work as an artist, occupying and consuming much of his time with legal/trial research & preparation as a 'pro se' litigant. Not a day passes without the presence of the lawsuit dynamics, memories, negative feelings, injustices, negligent official actions invading Mr. Raven's thoughts and feelings and routine.

4. Mental anguish, distress, frustration, anger, discouragement and bouts of depression have darkened plaintiff's door as a result of the actions of the Smithsonian Officials.

5. Art production has been reduced to a snails pace. Artistic focus and creative drive are hard to extract from a wounded and damaged artistic vessel.

6. Julian Raven is unable to stop living 'day to day' without the helpless feeling of frustration and acute awareness that one's rights have been violated by federal officials and government representatives. Complete loss of trust and respect for the Smithsonian Institution. Artist Julian Raven held the Smithsonian in high esteem since a dear family friend's husband, now deceased artist Hertzl Emmanuel has work in the Smithsonian.

7. Plaintiff has suffered embarrassment caused by such negligent conduct in that plaintiff

was wrongfully excluded from an event in the historic fine arts that by all accounts plaintiff was qualified to be a participant. Media interviews with the plaintiff surrounding the inauguration of President Trump relating to plaintiff's involvement in the inaugural festivities were marred by the inclusion of this unfortunate case and the negative story created by this unlawful and wrongful exclusion. Local anti-Trump media was unsurprisingly eager to cover the story!

8. Smithsonian and federal officials in this case either by action or inaction caused Artist Julian Raven to suffer 'wrongful exclusion' from this historic, unprecedented and priceless moment in American history and art history. The record will forever show the absence at the NPG of the Trump Portrait 'Unafraid And Unashamed' by not being included as originally requested as a celebratory tribute in the People's National Portrait Gallery to then President Elect Donald J. Trump during this historic election and presidential inauguration. As demonstrated in this case the NPG made great effort to celebrate the inauguration of President Barack Obama with politically relevant art and more in 2009 and 2013, increasing and diffusing historic pictorial knowledge to the American people. But in 2017 the Smithsonian National Portrait Gallery Director et al, deliberately chose to ignore the Will Of its founder Mr. James Smithson and the rights of both the 60,000,000(MILLION) plus Citizens and James Smithson Trust Beneficiaries who voted for Candidate Donald Trump to participation in the fine arts in an historical pictorial celebration of Donald J. Trump's unprecedented and historic win. This moment was priceless and plaintiff was wrongfully excluded.

That Compensatory Damages in the amount of ONE MILLION DOLLARS $1,000,000.00 be paid to plaintiff by the Defendants Sajet and Kurin in their individual

capacities, for their illegal actions in depriving plaintiff of his 1st and 5th Amendment Civil rights and the 'Due Process of law', to the 'wrongful exclusion' of plaintiff's participation in a Nationally important, supremely significant, 'once in a lifetime' historic, unprecedented and priceless moment in American history and art history as a professional artist.

The record will forever show the absence at the Smithsonian National Portrait Gallery of the Trump Portrait 'Unafraid And Unashamed' by not being included as originally requested as a celebratory tribute in the People's National Portrait Gallery to then President Elect Donald J. Trump during this historic election and presidential inauguration.

As demonstrated in this case the NPG made great effort to celebrate the inauguration of President Barack Obama with politically relevant art and more in 2009 and 2013, increasing and diffusing historic pictorial knowledge to the American people. But in 2017 the Smithsonian National Portrait Gallery Director et al, deliberately chose to ignore the Will Of its founder Mr. James Smithson and the rights of both the 60,000,000(MILLION) plus Citizens and James Smithson Trust Beneficiaries who voted for Candidate Donald Trump to participation in the fine arts in an historical pictorial celebration of Donald J. Trump's unprecedented and historic win. This moment was 'priceless' and plaintiff was 'wrongfully excluded'. Mr. Raven is a professional artist and this accomplishment for his career would again have been priceless. $1,000,000.00 is small change when compared to the participatory value and recognition deprived plaintiff in such an historic moment!

Plaintiff requests the damages be trebled due to the egregious conduct of the Smithsonian Officials.

**PUNITIVE DAMAGES**

That the jury in this case award punitive damages against the Defendants in their individual capacities to plaintiff Raven in the amount that is appropriate in the eyes of the jury according to the reasonably determined numerical single digit multiplier for compensatory damages awarded. Or however the Court orders punitive damages to be calculated.

Punitive damages must be awarded to serve as an agent of reform at the Smithsonian Institution and as a deterrent to similar actions in the future to ensure that the Smithsonian Institution and its Trustees and Officers act in harmony with its own rules and laws and without question with the laws and Constitution of the United States of America.

**PART 2**

**JURISDICTION**

The District Court, For the District of Columbia, in Washington D.C. has subject matter jurisdiction since this case involves; "…the United States Constitution;" Pro-se handbook Page 2. http://www.dcd.uscourts.gov/sites/dcd/files/ProSeNON-PRISONERManual.pdf

§ 11–501. Civil jurisdiction

"(C) relating to the execution or validity of wills devising real property within the District of Columbia, and of wills and testaments properly presented for probate in the United States District Court for the District of Columbia, and the admission to probate and recording of those wills;

(G) involving the enforcement of the rendition of inventories and accounts by executors, administrators, collectors, guardians, and trustees required to account to the court;" District of Columbia Court Reform and Criminal Procedure Act of 1970

(4) Any civil action (other than a matter over which the Superior Court of the District of Columbia has jurisdiction under paragraph (3) or (4) of section 11-921(a)) begun in the court during the thirty-month period beginning on such effective date wherein the amount in controversy exceeds $50,000.

**HISTORICAL & LEGAL CONTEXT OF THE SMITHSONIAN INSTITUTION**

"James Smithson, esquire, of London, in the Kingdom of Great Britain, having by his last will

and testament given the whole of his property to the United States of America, to found at Washington, under the name of the "Smithsonian Institution," an establishment for the increase and diffusion of knowledge among men; and the United States having, by an act of Congress, received said property and accepted said trust; Therefore, For the faithful execution of said trust, according to the will of the liberal and enlightened donor;" 29th Congress, 1st Session, August 10th, 1846

"SEC. 2. And be it further enacted, That so much of the property of the said James Smithson as has been received in money, and paid into the Treasury of the United States, being the sum of five hundred and fifteen thousand one hundred and sixty-nine dollars, be lent to the United States Treasury at six per cent per annum interest…" Smithsonian Act of Congress 1846

"SEC 3. And be it further enacted, That the business of the said Institution shall be conducted at the City of Washington by a board of regents, by the name of regents of the "Smithsonian Institution," Smithsonian Act of Congress 1846

"The Smithsonian Institution is a "trust instrumentality" of the United States—an organization established by the U.S. government as a public trust. Created by the US Congress on August 10, 1846, through 9 Stat. 102, the Institution carries out the bequest of James Smithson (1765-1829) to create an establishment "for the increase and diffusion of knowledge among men." Since 1846, public laws, judicial decisions, court cases, procedures of the Board of Regents, executive orders, and government reports have shaped the Institution's legal structure. The resources on this site will allow you to explore the legal documents that have shaped the Institution since its founding in 1846." https://siarchives.si.edu/history/legal-history

Article 2: "The Government Of The United States is merely a trustee to carry out the design of the testator." 'Programme Of Organization' by Secretary Joseph Henry adopted on December 13th, 1847 by the Board Of Regents.

Article 3: "The institution is not a national establishment, as is frequently supposed, but the establishment of an individual, and is to bear and perpetuate his name." 'Programme Of Organization' by Secretary Joseph Henry adopted on December 13th, 1847 by the Board Of Regents.

"The Smithsonian Institution is an establishment based upon the private foundation (italics Added) of James Smithson, a British subject, which was accepted by the United States in trust. This establishment was created by an act of Congress, under which act, with one or two unimportant modifications, it has since been governed. The United States Government has, from time to time, assigned to it important functions, and Congress has passed laws and made appropriations in support of these. While, therefore, it is a private foundation (Italics Added), of which the Government is trustee, it has in itself an extensive legislative history." S.P. Langley Secretary Of The Smithsonian Institution, The Smithsonian Institution Documents to its origin and history. 1835---1899 By William J. Rhees

The nature of the benevolent trust bequeathed by Mr. James Simpson for the 'increase and diffusion of knowledge' will only ever end once all knowledge has been 'increased and diffused among men.' Until such a time, the original intent of the testator and the establishment's founding mission and legal structure remain as originally enacted by Congress on August 10th, 1846 in the Smithsonian Institution Act.

**'Smithsonian Institution Statement of Values And Ethics', 2007**

**Smithsonian Employee and Officials Duty**

"The Smithsonian Institution is a public trust whose mission is the increase and diffusion of knowledge. The Smithsonian was established by the United States Congress to carry out the fiduciary responsibility assumed by the United States in accepting the bequest of James Smithson to create the Smithsonian Institution." Smithsonian Statement Of Values and Code of Ethics, 2007

"We are accountable to the general public as well as to the Smithsonian's multiple stakeholders in carrying out this responsibility. We recognize that the public interest is paramount." Smithsonian Statement Of Values and Code of Ethics, 2007

"Serving the Smithsonian is a privilege and those who work on its behalf have a responsibility to maintain the highest standards of honesty, integrity, professionalism, and loyalty to the Institution."

"We must ensure that our activities support the Smithsonian mission and take care to avoid conduct that would compromise the integrity of or public confidence in the Smithsonian. We acknowledge that in order to merit and preserve the public trust we must maintain a shared commitment to core values and an expectation of ethical and professional conduct in all of our activities." Smithsonian Statement Of Values and Code of Ethics, 2007

"This Statement of Values and Code of Ethics establishes the standards and principles for ethical conduct that apply to the Institution collectively and to all members of the Smithsonian community, which includes Regents, staff, volunteers, advisory board members, fellows, interns, research associates, affiliated individuals, and others who have been entrusted to act on behalf of or in the name of the Smithsonian."

"The Board of Regents was established by Congress to carry out the responsibilities of the United States as trustee of the Smithson trust.

"Given this unique and special status, the Smithsonian must be mindful that it is a public trust operating on 2 behalf of the American public and the United States government to carry out its mission to increase and diffuse knowledge."

"As such, the Smithsonian will be guided by the principles of the federal sector in the conduct of its activities whenever appropriate and consistent with its mission and trust responsibilities."

"In all other cases, the Institution will follow the principles and best practices for fiduciary stewardship in the nonprofit sector." Smithsonian Statement Of Values and Code of Ethics, 2007

"The Smithsonian Institution is committed to operating in a culture marked by openness, accessibility, and robust communication" Smithsonian Statement Of Values and Code of Ethics, 2007

"Effective transparency also requires open and reliable communication between the Board, management, and other stakeholders to support informed decision making." Smithsonian Statement Of Values and Code of Ethics, 2007

"Each member of the Smithsonian community is expected to act in accordance with professional standards, as well as with honesty, integrity, openness, accountability, and a commitment to excellence." Smithsonian Statement Of Values and Code of Ethics, 2007

"The Smithsonian promotes a working environment that values respect, fairness, and integrity." Smithsonian Statement Of Values and Code of Ethics, 2007

"We act in accordance with these values by treating our colleagues, the public, and others with whom we interact with dignity, civility, and respect." Smithsonian Statement Of Values and Code of Ethics, 2007

"We are each responsible for being aware of and complying with applicable professional standards that govern our conduct, including those that relate to our particular discipline." Smithsonian Statement Of Values and Code of Ethics, 2007

"COMPLIANCE WITH APPLICABLE LAWS All Smithsonian activities will be conducted in compliance with applicable laws, regulations, and international conventions. Members of the Smithsonian community are expected to become familiar with and comply with the laws and

regulations that apply to their areas of responsibility." Smithsonian Statement Of Values and Code of Ethics, 2007

"COMPLIANCE WITH SMITHSONIAN POLICIES, DIRECTIVES, AND PROCEDURES All Smithsonian activities will be conducted in accordance with established policies, directives, and procedures, which are designed to set standards for acceptable practices and activities. Members of the Smithsonian community are expected to conduct their activities in conformance with applicable policies, directives, and procedures and accordingly have an obligation to become familiar with those that apply to their areas of responsibility." Smithsonian Statement Of Values and Code of Ethics, 2007

"CONFLICTS OF INTEREST All members of the Smithsonian community have a duty to act in the best interest of the Smithsonian rather than in furtherance of their personal interest or for private gain. We must avoid apparent or actual conflicts of interest and ensure that potential conflicts of interest are disclosed and managed in accordance with applicable guidelines, directives, and standards of conduct." Smithsonian Statement Of Values and Code of Ethics, 2007

"GOVERNANCE The Board of Regents is the governing authority for the Smithsonian and has the ultimate authority and responsibility for ensuring that Smithsonian resources, programs, and activities support the Smithsonian mission." Smithsonian Statement Of Values and Code of Ethics, 2007

"The Board of Regents is responsible for establishing the strategic direction of the Institution, providing guidance on and oversight of Smithsonian policies and operations, ensuring that Smithsonian resources are responsibly and prudently managed in compliance with legal and ethical requirements, and regularly assessing the effectiveness of Smithsonian programs." Smithsonian Statement Of Values and Code of Ethics, 2007

"Regents are expected to understand their governance responsibilities and to devote the time and attention necessary to fulfill them." Smithsonian Statement Of Values and Code of Ethics,

2007

"The Board of Regents takes action as a body through the collective judgment of its members." Smithsonian Statement Of Values and Code of Ethics, 2007

"Individual Regents do not represent the Board, except as may be authorized by the Board." Smithsonian Statement Of Values and Code of Ethics, 2007

" The Secretary and appropriate staff ensure that the Board of Regents is provided with timely, accurate, and complete information to enable the Regents to fulfill their responsibilities." Smithsonian Statement Of Values and Code of Ethics, 2007

"Managers and supervisors are expected to lead by example, establishing and following a high standard of ethics and accountability to be adhered to at all levels of their organizations." Smithsonian Statement Of Values and Code of Ethics, 2007

"Policies and practices to ensure compliance with these principles, as well as consistency with professional standards and best practices for responsible stewardship and internal control, are established, disseminated, kept current, and consistently applied at all levels of the organization." Smithsonian Statement Of Values and Code of Ethics, 2007

"Accurate and complete records are maintained to support reliable financial reporting and to ensure accountability and positive control of the Smithsonian's physical and financial assets." Smithsonian Statement Of Values and Code of Ethics, 2007

"COLLECTIONS The Smithsonian develops, maintains, preserves, studies, exhibits, and interprets collections of art, artifacts, natural specimens, living animals and plants, images, archival and library materials, and audiovisual and digital media of unparalleled scope, depth, and quality. Stewardship of Smithsonian collections entails the highest public trust and carries with it the responsibility to provide prudent and responsible management, documentation, preservation, and use of the collections for the benefit of the public." Smithsonian Statement Of Values and Code of Ethics, 2007

"The Smithsonian conducts these activities in accordance with professional standards and

practices and ensures that legal requirements are observed and compliance is documented. Policies and practices to ensure compliance with these principles and consistency with professional standards and best practices for responsible collections stewardship are established, clearly articulated, disseminated, kept current, and consistently applied." Smithsonian Statement Of Values and Code of Ethics, 2007

"EXHIBITIONS, EDUCATION, AND PUBLIC PROGRAMS To carry out its mission to increase and diffuse knowledge, the Smithsonian engages in and supports a vast array of exhibitions and educational and public programs in science, art, history, and culture. The Smithsonian conducts these activities in accordance with professional standards and practices and ensures that accuracy and intellectual integrity are the foundation 5 for all exhibitions and educational and public programs produced in its name or under its auspices." Smithsonian Statement Of Values and Code of Ethics, 2007

"We acknowledge and address diverse values, opinions, traditions, and concerns and ensure that our activities are open and widely accessible. Policies and practices to ensure compliance with these principles and consistency with professional standards and best practices are established, clearly articulated, disseminated, kept current, and consistently applied." Smithsonian Statement Of Values and Code of Ethics, 2007

"TRANSPARENCY AND DISCLOSURE

The Smithsonian provides accurate and comprehensive information about its finances, operations, and activities to the public, Congress, and other stakeholders and responds in a timely manner to reasonable requests for information. We engage in open and reliable communication between and among the Board of Regents, management, and other stakeholders to support informed decision making." Smithsonian Statement Of Values and Code of Ethics, 2007

"INCLUSIVENESS AND DIVERSITY The Smithsonian values and promotes inclusiveness and diversity in all of its activities, including employment practices, board and volunteer

recruitment, and programs. The Smithsonian is enriched and its effectiveness enhanced when the Smithsonian community and the constituents we serve are composed of diverse individuals with varied backgrounds, experience, and points of view. "Smithsonian Statement Of Values and Code of Ethics, 2007

"IMPLEMENTATION While the Board of Regents retains the ultimate responsibility for requiring and overseeing compliance with this Statement of Values and Code of Ethics, each Regent, employee, volunteer, and other member of the Smithsonian community to whom it applies has a personal responsibility to comply with this Statement. The Secretary will ensure that the Statement is widely disseminated to Regents, staff, volunteers, advisory board members, and other members of the Smithsonian community, as well as to the public and interested stakeholders. The Secretary will ensure that appropriate policies and directives providing necessary guidance are in place and kept current. The Secretary, in consultation with the General Counsel, will establish an internal Ethics Advisory Board to provide advice to the Secretary and Board of Regents on compliance with this Statement of Values and Code of Ethics." Smithsonian Statement Of Values and Code of Ethics, 2007

https://www.si.edu/content/governance/pdf/Statement_of_Values_and_Code_of_Ethics.pdf

**GENERAL LEGAL PRINCIPLES & PARAMETERS OF THE COURTS WHEN DEALING WITH TRUSTS**

The "courts have broad discretion over trustees and trust assets at all stages of litigation. This broad discretion stems from the fact that beneficiaries have equitable title to trust property and disputes involving trust assets are actually equitable actions. Firmly established case law gives courts broad discretion over trustees or other fiduciaries that have legal title to property that is the subject of an equitable action. Hunter v. United States, 30 U.S. 173, 188

(1831) ("It is the peculiar province of equity, to compel the execution of trusts."); see also Hopkins v. Granger, 52 Ill. 504, 510 (1869) ("It is one of the oldest heads of chancery jurisdiction, to execute and control trusts and trust funds.")"... The courts' broad discretion means that the remedies available in a trust---related dispute—even when there is no actual loss— broadly include instructing the trustee about the terms of the trust, setting aside decisions of the trustee, removing the trustee, and appointing a temporary fiduciary with highly customizable powers. Restatement (Third) of Trusts § 95, cmt. c." http://www.americanbar.org/publications/probate_property_magazine_2012/2013/january_february_2013/article_ebner_shutting_down_fiduciary.html

"The trust cannot hold property, or the title to the property like a corporation. A trust is a fiduciary relationship with respect to property. (Ziegler v. Nickel, 64 Cal. App. 4th 545, 548 (1998)." http://www.wkblaw.com/wp-content/uploads/2012/02/Taking-Title-to-Trust-Assets.pdf

"An ERISA "functional" fiduciary, according to the federal courts, includes anyone who exercises discretionary authority over the plan's management, anyone who exercises authority or control over the plan's assets, and anyone having discretionary authority or responsibility in the plan's administration." 2. Mertens v. Hewitt Assoc., 508 U.S. 248, 262 (1993). 3. Credit Managers Ass'n v. Kenesaw Life & Accident Ins. Co., 809 F.2d 617, 625–626 (9th Cir. 1987). http://www.jonesday.com/files/Publication/a44d1eef---b9c0---411f--- 83e7---a8c21612a575/Presentation/PublicationAttachment/52ee40c5---6084---4a72--- af9e---aada122b17c4/BLJ_Spring09_James.pdf

**THE PARTIES**

Plaintiff 'pro se' Julian Marcus Raven is a citizen of Elmira, New York. Mr. Raven is married with three children and a professional artist. Plaintiff is the artist who painted the Donald Trump portrait/painting 'Unafraid and Unashamed' in the summer of 2015 about which this case is.

The Smithsonian Institution's National Portrait Gallery Director Kim Sajet, Chief Curator Brandon Brame Fortune, Dr. Richard Kurin, Smithsonian Acting Provost and Chief Spokesperson Linda St. Thomas in their official capacities.

The entire Smithsonian Board Of Regents, Represented by Chief Justice John Roberts, Chancellor also including Former Vice President Joseph R. Biden, Jr. Senator John Boozman, Senator Patrick J. Leahy, Senator David Perdue Representative Xavier Becerra, Representative Tom Cole, Representative Sam Johnson, Mrs. Barbara M. Barrett, Mr. Steve Case, Mr. John Fahey, Mrs. Shirley Ann Jackson, Mr. Robert P. Kogod, Mrs. Risa J. Lavizzo---Mourey, Mr. Michael M. Lynton, Mr. John W. McCarter, Jr., Mr. David M. Rubenstein are Co---In their official capacities, Trustees of the Will and Trust of Mr. James Smithson.

The U.S. Congress represented by chairman of the Committee On Rules And Administration Congressman Roy Blunt in his official capacity, are Trust 'Legatees' of The Will and Trust of James Smithson. (Article 1 of the 1846 Act Of Congress) Said committee has functional oversight over the Smithsonian Institution.

**NATURE OF ACTION AGAINST THE USA, THE SMITHSONIAN INSTITUTION'S OFFICIALS, IN THEIR OFFICIAL CAPACITIES AND AN ELECTED REPRSENTATIVE**

The **Federal Tort Claims Act** (June 25, 1946, ch. 646, Title IV, 60 Stat. 812, "28 U.S.C. Pt.VI Ch.171" and 28 U.S.C. § 1346(b)) ("**FTCA**") is the basis upon which plaintiff brings his suit

against all of the defendants in their official capacities.

**Jurisdiction Of the FTCA:**

The Smithsonian Institution as a government 'instrumentality' qualifies as a 'Federal Agency' under the FTCA since its definition includes, "…independent *establishments* of the United States, and corporations primarily acting as *instrumentalities* or agencies of the United States…" 28 U.S. Code § 2671 – Definitions
""Employee of the government" includes (1) officers or employees of any federal agency" 28 U.S. Code § 2671 – Definitions

"*Be it Enacted By the Senate and House of Representatives of the United States of America in Congress assembled*. That the President and Vice-President of the United States, … during the time for which they shall hold their respective offices, and such other persons as they may elect honorary members, be, and **they are hereby constituted, an "establishment,"** by the name of the "Smithsonian Institution," for the increase and diffusion of knowledge among men;" Smithsonian Act, 1846

"The Smithsonian Institution **is a trust instrumentality** of the United States, lawfully created by Congress in 1846 to exercise the authority of the United States in carrying out the responsibilities Congress undertook when it accepted the bequest of James Smithson "to found at Washington, under the name of the Smithsonian Institution, an establishment for the increase and diffusion of knowledge among men."
https://www.si.edu/ogc/legalhistory

**FTCA Exhaustion of Administration Remedies Required:**

**1.** Mr. Raven was directed to 'appeal the arbitrary decision' by the Smithsonian national Portrait Gallery Director Kim Sajet.

2. Mr. Raven did 'appeal' in writing by email and regular certified mail to the Board of Regents.- ***No Response directly from the BOR(Board of Regents from here on.)***

3. Plaintiff's appeal was handed off to Dr. Richard Kurin, acting provost for adjudication according to Dr. Kurin's letter.

4. Dr. Kurin refused to acknowledge the letter of appeal as an appeal.

5. Dr. Kurin denied plaintiff's right to an appeal.

6. Dr. Kurin concurred with the undocumented, Smithsonian standards violating, unlawful actions of the NPG Director Kim Sajet, rejected plaintiff's legal appeal for an institutional remedy and politely slammed the door on plaintiff's appeal and application.

7. Mr. Raven replied in writing and objected to Dr. Kurin's arbitrary letter, challenging his failure to grant or even acknowledge plaintiff's appeal. ***No response!***

8. Plaintiff Raven had appealed to the Board of Regents Chief of Staff, Porter Wilkinson. – ***No response!***

9. Plaintiff Raven appealed to the Board of Regents lawyers.- ***No Response!***

10. Plaintiff Raven had appealed to the Smithsonian Office of Legal Counsel- ***No Response!***

11. Recently plaintiff contacted the Smithsonian Inspector General about this case***. No Response!***

12. Mr. Raven had no choice but to file a federal lawsuit in the District Court for the District of Columbia in the pursuit of justice!

13. At no point was Mr. Raven informed by any of the parties to which he had appealed about his rights and procedures under the FTCA.

14.Mr. Raven is an artist, not a lawyer, and is representing himself 'pro se', plaintiff had no idea about the FTCA and was never informed by Smithsonian Officials that the FTCA was a

remedy that plaintiff could use.

15. Every effort to find a remedy to the blatant negligence Mr. Raven experienced, since all institutional procedures and official standards were completely ignored, when every official named in this suit had a duty to perform and act accordingly.

The bedrock of the FTCA Act, is that of federal and government officials and employees being negligent or official 'negligence' by action or inaction.

The remaining defendants, Chief Curator Brandon Brame Fortune, Chief Smithsonian Spokesperson Linda St. Thomas and the Board Of Regents members and the U.S. Congress represented by Congressman Roy Blunt in their official capacity as federal officers employees of a federal government instrumentality, Trust 'Legatees' and Co---Trustees, fiduciary delegates, functional fiduciaries of the private and individual Will and Trust Of Mr. James Smithson are hereby accused of violating Rules & Laws pertaining to:

A: Fiduciary Duties pertaining to Trusts, Trustees and Trustee Delegates 28 U.S. Code § 959--- Trustees may be sued

15 U.S. Code § 80a–35 --- Breach of fiduciary duty

29 U.S. Code § 1109 --- Liability for breach of fiduciary duty 29 U.S. Code § 1105 --- Liability for breach of co---fiduciary

B: Federal And Smithsonian Institution Rules of Ethical employee conduct

§ 2635.101 Basic obligation of public service.

The 14 General Principles of Ethical Conduct For Federal Employees Articles 1,5,8,11,13,14

C. Wrongful Exclusion

5 U.S.C. § 706 (1) (2)(A)(B)(C) (D) (E)

5 U.S. Code § 552 articles (a)(2)(A)(B)

The Smithsonian 'Statement of Values and Code of Ethics, 2007

The U.S. Congress accepting the role as Trust 'Legatee' of the Will of James Smithson did appoint a Board Of Regents as Co---Trustees of the Will Of James Smithson. The Board Of Regents in their official capacity as Trustee 'Regents' are 'merely' Trustees (of a private trust or foundation! Added), ("The Government Of The United States is merely a trustee to carry out the design of the testator" Article 2, Programme Of Organization, Joseph Henry, 1847) rendering any other official government title, function, authority or immunity they may possess, powerless in the execution of their duties as Trustee 'Regents', (Smithsonian Congressional Enactments 1846) thus removing all appeals to any type of immunity whether, absolute, judicial or qualified immunity.

**BACKGROUND OF EVENTS**

On July 9th, 2015 he embarked upon a creative artistic and political journey that involved painting the now historic, patriotic, predictive and symbolic portrait of then presidential candidate Donald J. Trump. The nearly 8x16 foot painting in acrylics on stretched canvas and beautifully framed in a decorative red, white and blue frame became the most recognized pro---Trump political portrait/painting during the 2015---2016 campaign. From New York to Los Angeles, reactions to the painting often ended with the comments that this painting should end up in the Smithsonian National Portrait Gallery in Washington D.C. After an historic grassroots political campaign, candidate Trump became the President of The United States on November 8th, 2016. What followed was the disturbing and disheartening experience with the Smithsonian National Portrait Gallery and The Smithsonian Institution.

On November 21st, 2016, less than two weeks after the election of Donald J. Trump, plaintiff

did go in person to the Smithsonian Affiliate in Corning, New York, The Rockwell Museum of Art to request assistance submitting an application to the Smithsonian National Portrait Gallery (Hereinafter "NPG") to show his Trump Portrait 'Unafraid And Unashamed' as part of the festivities for the 2017 Inauguration. Plaintiff was told that Director Swain and Executive Smithsonian Liaison Campbell were at lunch. Upon his return after lunch he was told they were both now gone for the day. It seemed odd to the plaintiff!

Plaintiff did follow up with an application by email to the attention of Director Kristen Swain and Rockwell/Smithsonian liaison Patty Campbell. Upon no reply after a week, plaintiff did go in person again on Monday the 28th of November with application and prints in hand. This time Executive Smithsonian Liaison Campbell did come down. The expression on her face was very cold, it was as if her face was frozen, no emotions were present. No warmth at the first personal meeting, just an expression devoid of emotional warmth.  The cold shoulder was now evident!

Plaintiff asked if she had received the email application to which she said she had. Executive Liaison Campbell was quick to inform plaintiff that since The Rockwell Museum was a 'non---profit' organization they could not get involved with 'politics'. Plaintiff was quick to remind Ms. Campbell that at the end of October, 2016 less than two weeks before the general election the Rockwell Museum had Hollywood Actor, Democrat Political Activist, DNC speaker, Bernie Sanders Activist, Former Whitehouse Director for Youth Engagement under President Obama, Kal Penn come as a special guest speaker to the museum. Kal Penn spoke on 'Art and Politics'.

Executive Smithsonian Liaison Campbell was stopped in her tracks! Plaintiff asked for help since time was passing quickly with just under two months before the election.  Plaintiff's request was for either help forwarding the application to the NPG or an invitation to be

involved and become a sponsor of the event since it could have a great and positive impact for our depressed local upstate New York region.

The next day, Director Kristen Swain responded via a short email. She informed plaintiff that the Rockwell Museum was unable to help since they did not have the 'resources'! Out of curiosity plaintiff spoke with Actor Kal Penn's agent to find out what is would cost to have him come and speak at a similar event to what just took place at the Rockwell Museum just a few weeks prior. Plaintiff was told it would cost $60,000.00!

Plaintiff subsequently did file an official complaint with the Smithsonian Director of Affiliations Harold Closter against the Rockwell Museum for their overt anti---conservative, anti---Trump bias and for failing to simply assist plaintiff in submitting his application to the NPG. The Rockwell Museum claimed to be an affiliate of the Smithsonian connecting our community to the Smithsonian. Director Closter did inform plaintiff that same day, the 30th of November 2016, that had forwarded the email as requested. Out of all the officials involved in this fiasco, Director Closter behaved with courtesy and professionalism!

**FACTUAL ALLEGATIONS**

Upon receiving confirmation of said application Mr. Raven did call the Director of the Smithsonian NPG Kim Sajet on the morning of December 1st. 2016 at around 11:20 a.m. to inquire as to the 'application' process. Mr. Raven wanted to ensure that there was nothing lacking in the 20 plus page application document, which included letters of recommendation from elected representatives from upwards of 200,000 people. These included Congressman Tom Reed, New York Senator Tom O'Mara, Elmira Mayor Dan Mandell, New York GOP chairpersons, Cox, Cady, King, Strange, radio personality Frank Acomb and art collectors

Gates/Davis.

Plaintiff did learn that the Director was not available, that she was not in. After leaving his phone number with the assistant to the Director of the NPG, since she informed plaintiff that the Director was not in or available that day. Plaintiff expected a call the next day or thereafter to inform him of any further steps necessary for the application process.

Within 15 minutes of the initial phone call to the assistant, plaintiff's phone rang. It was a call from the same number plaintiff had just dialed. It was to his surprise Director Kim Sajet! The Director's actions evince a "Specific Intent" by responding so quickly to plaintiff's call, less than 24 hours since the application and less than 15 minutes after plaintiff's initial call. Remember plaintiff was told the Director was not even in or available! Something motivated the Director to make special effort. Was this call the Director fulfilling her duty to care?

What was the motive for this call? Could this rapid response mean a keen and excited interest in plaintiff's application, proposal and desire to show his Trump painting, due to the fast approaching inauguration? Could this call be the answer to the 'information request' to an officer delegate of the Board Of Regents and Trustees, plaintiff had made as a 'beneficiary' of the Will Of James Smithson?

No, instead the call immediately manifested another "specific intent" and was instantly thus a violation because plaintiff's 'information request' or application was met with a refusal from the National Portrait Gallery to fulfill her duty to respond according to Smithsonian standards, values and procedures.

Rather, the arbitrary phone call had the feeling that the Director wanted to give the plaintiff a 'piece of her mind.'

Breach of Duty of Loyalty, Duty of Care,

Violation of Federal & Smithsonian Standards Of Ethical Conduct

This surprise call would lead to an eleven-minute dialogue and at times argument with the NPG Director, as Dir. Sajet would lay out her partial, dishonest, arbitrary, Smithsonian standards ignoring, violating and personal anti---Trump 'objections' as to why the NPG would not even consider plaintiff's painting for the application process. The Painting was refused even before given a fair and objective consideration according to Smithsonian Institution standards.

Plaintiff was left stunned, as if stung by a swarm of bees!

**DIRECTOR KIM SAJET OBJECTIONS:**

These arbitrary objections ranged from its size being 'too big' to partially and incorrectly citing an NPG standard for acceptance, to claiming the image was too 'Pro-Trump', 'Too Political', 'not neutral enough' and finally 'no good'.

**"TOO BIG"**

Without any cordial, official written response, Director Sajet by phone began to object to the Trump Portrait. It is clear from the first objection about the size that the director was rushing to judgment and expressing a personal, partial and biased opinion. Nowhere in the Smithsonian Institution's standards of acceptance for portraiture is there any mention of supposed appropriate sizes of paintings! The hasty phone call less than 24 hours after the

application had been received, calls into question whether Director Sajet even consulted with Chief Curator Brandon Brame Fortune or any other official at that time, as is required by Smithsonian procedures when considering a painting, this fact is yet to be discovered. Smithsonian FAQ "The Smithsonian acquires thousands of objects and specimens each year for its collection holdings through donation, bequest, purchase, exchange, and field collecting. The Institution accepts only items that truly fill a gap in the collections and then only after careful consideration by museum curators and directors. Because of this rigorous selection 'process', the Smithsonian adds to its collections only a tiny percentage of what it is offered." https://www.si.edu/FAQs

Surprisingly, after about five minutes into the heated discussion, Director Sajet when repeatedly challenged about her objection to the size of the painting, began to backtrack and eventually apologized for her ridiculous objection! This erratic behavior is evidence of a deliberate, intentional, hasty and partial personal opinion, one not based or grounded in Smithsonian Institution Standards! The sudden change of opinion about her first objection about the scale of the painting indicated that Director Sajet clearly knew, that her words and actions were inconsistent with Smithsonian standards and procedures, since in the midst of her objecting, she dramatically made an 'about face' turn, demonstrating her opinion to be arbitrary, since the reality in the Smithsonian spoke to the contrary. This self-incriminating and guilty behavior at the outset of the conversation established the arbitrary context for the rest of the conversation, that later compelled plaintiff to investigate, and subsequently discover the reason for Director Sajet's change of mind. The evidence discovered, proves the initial objection was absolutely partial and biased against plaintiff and his Trump Portrait. Director Sajet was eager to rush to judgment and was eager to personally give plaintiff her biased objections. It is still to be discovered if Chief Curator Fortune agreed with the objection.

What was Director Sajet hiding? For an objection about scale from an institution whose mission is for the 'increase and diffusion of knowledge' again seems contrary. How can you get an 'increase' by limiting the size! An 'Increase' when applied to the pictorial arts would include the size of the art as a quantifiable factor when measuring 'increase'. It would be similar to objecting to a T---Rex skeleton as 'too big' or a giant golden nugget as 'too big' or Michael Angelo's statue of David as 'too big!' or the two huge 6 x 8 foot (93"x75") portraits of President Obama by photographer Chuck Close, that were loaned to the NPG to be shown in the Smithsonian National Portrait Gallery specifically for the 2013 'Inauguration Celebration' of then re--- elected President Obama! (Ex. CCC)

LOANED PORTRAIT PRECEDENT FOR INAUGURATIONS

At President Obama's inauguration in 2013 two huge Obama Portraits were secured for the celebrations. From the Smithsonian website we read; "Diptych of President Barack Obama by Chuck Close. The renowned artist Chuck Close created two photographs of Barack Obama and transferred them onto two large---scale (93---by---75---inch) jacquard tapestries. In conjunction with the Inauguration, this diptych has been loaned to the Smithsonian's National Portrait Gallery by Ian and Annette Cumming."(Italics & bold added) http://newsdesk.si.edu/releases/smithsonian--- celebrates-2013-presidential-inauguration-exhibits-and-programs (Ex. VVV)

Without knowing anything about the 2013 'Inauguration Celebration' at the NPG, plaintiff wrote this on December 7th, 2016, at the end of his appeal to the Board Of Regents upon his rejection by NPG Director Kim Sajet: "Please be considerate of the fact that January 20th, 2017 is fast approaching and it would be most fitting to pictorially and artistically celebrate and

coincide with this historic inauguration of the 45th president Of The United States, President Elect Donald J. Trump, by having my portrait on display in the National Portrait Gallery." This was plaintiff's offer to 'loan' his portrait for the celebration of the Trump Inauguration. http://www.unafraid-and-unashamed.com/smithsonian-appeal.html (Ex. RRR)

Since a clear 'Portrait lending' precedent for a Presidential Inauguration was established in 2013, a right of participation was created, a participation in inaugural celebrations for artist who have created portraits of soon to be inaugurated Presidents. These artists/collectors could of right apply to have their work shown for the inauguration. If there were multiple pieces offered, then a selection process would take place. But if there was only one painting offered, then by default that would automatically qualify as the loaned presidential portrait.

'TOO BIG' plaintiff was told, and it turns out that the 'loaned' diptych art work measured nearly 105 square feet of occupied wall space including the gap in between the two huge Obama portraits. Without the decorative frame, the Trump Portrait measures just shy of 105 square feet, **nearly exactly the same size**!

18 U.S. Code § 1001 – (FALSE)Statements or entries generally 14 Standards Of Ethical Conduct--- Smithsonian https://www.si.edu/content/OGC/SD103.pdf

§ 2635.101 Basic obligation of public service.

The 14 General Principles of Ethical Conduct For Federal Employees Articles 1,5,8,11,13,14 https://www.justice.gov/ncfs/file/761076/download

**"NOT FROM LIFE"**

Director Sajet continued, saying the Trump portrait was disqualified from consideration since

it was not created from life, partially citing a Smithsonian Standard for portraiture acceptance. At this point Mr. Raven was in disbelief. Plaintiff immediately cited the Smithsonian reception and showing of the Shepherd Fairey Obama 'Poster' on January 13th, 2009. Plaintiff being intimately acquainted with the story of its creation, appealed to the poster as evidence that the NPG surely did show work not taken from life. At this point, since the Director's second objection was now questioned, the Director repeatedly insisted that the Shepherd Fairey political campaign poster, had in fact been created from a live sitting by the artist with then Candidate Barrack Obama! This is absolutely false! The Director did not back down on this statement, thus clearly violating federal law regarding the making of false statements by federal employees and the General Principles of Ethical Conduct for Federal Employees.

18 U.S. Code § 1001 – (FALSE) Statements or entries generally 14 Standards Of Ethical Conduct--- Smithsonian https://www.si.edu/content/OGC/SD103.pdf

§ 2635.101 Basic obligation of public service.

The 14 General Principles of Ethical Conduct For Federal Employees Articles 1,5,8,11,13,14 https://www.justice.gov/ncfs/file/761076/download

This was where the NPG Director twisted the truth to support her bias in favor of the Obama poster and obviously Barack Obama. One only has to examine the criminal conviction of the artist in question regarding the 'Hope' poster, Shepherd Fairey to discover that the 'Hope' poster was a digitized photograph taken from the internet from AP photographer Mannie Friedman. It turns out that the 'requirement from life' rule Director Sajet cited was partially true, the Smithsonian standard did require portraits to be from life. But as with this entire story, the guideline was quoted partially since it says; "that works must be the best likeness possible; original portraits from life, if possible;"

http://siarchives.si.edu/history/national---portrait---galler

It turns out that out of the 4 Donald Trump 'portraits' the NPG owns, only 1 of the 4 was actually taken from life. It turns out that one of the four 'portraits' is actually a cartoon sketch of Donald Trump! Either Director Sajet was unaware of the existing stock of the Donald Trump portraits in her possession and of their back story regarding originality from life or she deliberately obscured the truth and made up the argument in her repeated efforts to deny plaintiff entry into the application process? Federal Employees And Smithsonian Employees are ordered by law to be 'Loyal To the Constitution', 'Honest', 'impartial' etc. in their decisions and conduct. Already Director Sajet is in violation of articles 8 regarding being 'impartial', The 14 General Principles of Ethical Conduct of the FEDERAL Gov. 5 C.F.R §2635.101 (b)
https://www.si.edu/content/OGC/SD103.pdf
https://www.justice.gov/ncfs/file/761076/download

**"TOO PRO-TRUMP"**

Director Sajet now moved to her next partial and biased objection. The Trump Portrait was too 'PRO-TRUMP'! 'It is not neutral enough' Director Sajet continued. Not only are Smithsonian Employees to be impartial, they are to follow the clearly established 'standards' for judging or testing a work of art. The 'Hope' Poster, created for Barrack Obama's political campaign in 2008 is nothing but 'PRO--- OBAMA'. The whole essence of the Obama poster was to portray Presidential candidate Barrack Obama in the most favorable political light, as a visionary leader gazing upwards! What would be the point if it was not 'PRO---OBAMA'? Again clear and blatant bias and partiality is demonstrated in this arbitrary objection.
https://www.si.edu/content/OGC/SD103.pdf

In the 2013 'Celebration' Inauguration of President Obama, the NPG hung TWO huge 6x8 foot

photo portraits of President Obama side by side along with the 'Hope' poster from 2008 a total of 3 'PRO' Obama portraits no less! And I am told that one portrait of Donald Trump is 'TOO PRO TRUMP'? This is obviously another false, biased and partial statement!

Code § 1001 – (FALSE)Statements or entries generally
14 Standards Of Ethical Conduct--- Smithsonian https://www.si.edu/content/OGC/SD103.pdf
§ 2635.101 Basic obligation of public service.
The 14 General Principles of Ethical Conduct For Federal Employees Articles 1,5,8,11,13,14
https://www.justice.gov/ncfs/file/761076/download

**"TOO POLITICAL"**

Director Sajet, from the outset of the phone call, mentioned the imagery of the eagle in the painting in a negative light. Without saying it by her tone, Director Sajet was implying the painting was 'too patriotic'. Whilst complaining that the trump Painting was not 'neutral enough' the Director repeatedly mentioned the George Washington Lansdowne portrait in the NPG since it too has a fully developed background(It turns out it is layered in symbolism like the Trump Portrait!) and is not just a portrait of the face of the subject. It was as if Director Sajet was compelled to excuse the Washington portrait whilst objecting to the Trump portrait since it contradicted her objection to the Trump portrait's content. An analysis of the Washington portrait reveals a much large ratio of background and body to the shoulders, head and face than is contained in the Trump Portrait which is about 40% head and face. An analysis of the Trump cartoon sketch, part of the 4 portraits owned by the NPG also reveals another contradiction to the Directors objections as to the ratio of background verses head, face and shoulders.

Again, to be noted, Director Sajet's opinion was devoid of Smithsonian Institution standards. Eventually the Director came out and said it. The Trump Portrait was in fact 'TOO POLITICAL'! Again to plaintiff's astonishment, the NPG Director had now objected to the historical context, the political and presidential campaign of 2015---16, the unprecedented campaign of Donald J. Trump and to the content of the Trump Portrait. The American Flag, the Bald Eagle, the representation of the geographical United States, The Statue of Liberty are some of the American symbols used in the narrative of the Trump Portrait and these are too political in the 'National' Portrait Gallery? They are patriotic rather than political. The title 'Unafraid And Unashamed' is relating to Trump's character politician or not!

**ELECTION RELATED POLITICAL ART ACCEPTED BUT NOT FOR ARTIST RAVEN**

By accepting the political art from Democratic Washington 'super lobbyists' who said on Jan. 7th 2009 "It seemed like a historic moment for the country, and a chance to do something for art and Democrats," Tony Podesta, brother of transition co---chairman John Podesta" when discussing donating the 'Hope' poster to the National Portrait Gallery. And since the political art was created by confessed 'hard core left wing activists' for a political campaign about a Democrat left wing activist political presidential candidate and then President Elect Obama, a clear political campaign art precedent was established! Neglect of the duty of impartiality. http://voices.washingtonpost.com/reliable---source/2009/01/rs---portrait7.html

The NPG made it clear it accepted art/gifts/political beliefs/speech from Democrat left wing activists. The Obama poster is a highly political work of art, it even contains a campaign slogan 'HOPE' used for campaigning for Presidential Candidate Barrack Obama as the candidate of the people's 'hope'.

"NO GOOD"

After Director Sajet's objections were all refuted, the Director's final and seemingly desperate, personal and arbitrary opinion was that she did 'not like' the portrait and the Director said that it was 'no good', again showing her personal bias against plaintiff and his painting and thus neglecting to adhere to Smithsonian values and ethics. And again neglecting the Smithsonian Standard; "Thus, the standards for accepting portraits varied considerably from other galleries. Even today, in every instance, the historical significance of the subject is judged before the artistic merit of the portrait, or the prominence of the artist." But regardless of what the Smithsonian has to say, Director Sajet was to have the last word and that was final!

http://siarchives.si.edu/history/national---portrait---gallery

Based upon Director Sajet's final taunting words to the plaintiff this complaint has been filed. The final words were: 'I am the Director of the National Portrait Gallery, this application will not go forward or even be considered, you can appeal my decision all you want…'

"Write down exactly what was said to you by the offender, taunt reveals motive" according to the Bakersfield Police Department on their Hate Crimes brochure.

http://www.bakersfieldcity.us/civicax/filebank/blobdload.aspx?BlobID=29731

Plaintiff did write down what was said immediately!

It is clear that this type of statement evinces an abuse of authority and a neglect of the duties for the Director Of the National Portrait Gallery, in that all Smithsonian Institutional procedural 'due process' was stripped away from plaintiff Raven, from the Smithsonian Institution and from the Smithsonian Trust Beneficiaries, the American People. Everything the Smithsonian Institution stands for, the 'increase and diffusion of knowledge for all men', the Smithsonian Board of Regents approved standards for acceptance of portraiture has been cast aside by the wanton neglect of the Smithsonian Official.

Telling plaintiff that the work is 'no good' is a partial, personal opinion and a false statement in the context of the Smithsonian Standards of acceptance since artistic merit is not a criterion for acceptance at the NPG. http://siarchives.si.edu/history/national---portrait---gallery This can be seen by Trump Cartoon 'Portrait' which is part of the NPG portrait collection! http://www.unafraid---and---unashamed.com/smithsonian---trump--- portraits.html 18 U.S. Code § 1001 – (FALSE)Statements or entries generally 14 Standards Of Ethical Conduct--- Smithsonian https://www.si.edu/content/OGC/SD103.pdf § 2635.101 Basic obligation of public service. The 14 General Principles of Ethical Conduct For Federal Employees Articles 1,5,8,11,13,14 https://www.justice.gov/ncfs/file/761076/download http://siarchives.si.edu/sites/default/files/pdfs/9_Stat_102.pdf Section 11 (Individual Right)

Smithsonian Institution FAQ from SI website: "The Smithsonian acquires thousands of objects and specimens each year for its collection holdings through donation, bequest, purchase, exchange, and field collecting. The Institution accepts only items that truly fill a gap in the collections and then only after careful consideration by museum curators and directors.

Because of this rigorous selection 'process', the Smithsonian adds to its collections only a tiny percentage of what it is offered." https://www.si.edu/FAQs

The 1962 commission clearly said "Thus, the standards for accepting portraits varied considerably from other

galleries." http://siarchives.si.edu/history/national---portrait---gallery

Please see The Smithsonian NPG Bias Chart for a list of standards. http://www.unafraid---and---unashamed.com/smithsonian---bias---chart.html

By ignoring those 'standards' Director Sajet has become judge, jury and executioner using her own personal and biased anti---Trump opinion for rejection or acceptance. As a Trustee Delegate, 'Functional Fiduciary', Director Sajet has violated all of the duties of Fiduciary responsibility under the vast panoply of laws that govern the business & behavior of Trusts, Trustees and their Delegates.

**NEGLIGENCE RESULTS IN 'WRONGFUL EXCLUSION'**

In NAACP LEGAL DEFENSE, ETC. V. CAMPBELL (1981) United States District Court, D. Columbia. 504 F. Supp. 1365 (D.D.C. 1981) Gesell, District Judge

a clearly settled legal case establishes plaintiff's claims to 'wrongful exclusion' as authoritative. Opinion by District Judge Gesell clearly establishes the merits of this case since in said case(504F.), plaintiffs were excluded because of a faulty interpretation of 'vague' standards of participation in a Government established program.

In this case, plaintiff Raven is not arguing against the vague interpretation of a statute, but against the complete violation and ignoring of the statutes of participation. Statutes in plaintiff Raven's case are clear and not in the slightest bit vague. Since plaintiffs in said case (504 F.)

prevailed in the District Court in the District of Columbia in their case(504 F.) for a vague interpretation of a single statue, how much more should plaintiff in this case?

Case (504 F.) marvelously parallels plaintiff Raven's claims in many ways in the principles of the argument, the rights of participation, the conditions for participation, arbitrary decisions etc.; Although the Administrative Procedure Act does not apply to the Smithsonian, the principles and process that lead to 'wrongful exclusion' do. E.g. a. "Procedures and requirements for the Campaign are set forth in the Manual on Fund---Raising Within the Federal Service for Voluntary Health and Welfare Agencies. Organizations participate in the CFC on either the national or local level. Eligibility is determined by officials of the Office of Personnel Management, successor to the Civil Service Commission, in accordance with the standards set forth in the Manual."; b. "It behooves the government officials responsible for the program to re---examine the basic premises on which the program was established" c. "the Court finds that defendant's rejection of plaintiffs' applications to the CFC, based solely on a failure to satisfy the "direct services" requirement of section 5.21 of the Manual, must be set aside pursuant to this Court's review of agency action under the Administrative Procedure Act" d. "Defendant shall not reject any pending or future application of plaintiffs on this ground." Judge Gesell, U.S. District Court in the District of Columbia.

Upon further research of the multiple, clearly established and clearly understood, congressionally appointed Board of Regents approved principles/criteria of acceptance of 'art'/portraiture into the Smithsonian NPG both in the 'Programme Of Organization' from 1847 and in the standards set by the 1962/62 Congressionally appointed commission for the creation of the National Portrait Gallery, plaintiff was further grieved and disturbed by the undocumented and personal call he had received from Director Sajet.

Plaintiff had presented an 'elected representative' and thus publically supported, 20 plus page written application to the NPG. Mr. Raven's application would be cast aside by one bizarre eleven minute, anti-Trump, arbitrary, unfounded and personally opinionated phone call by the NPG Director Kim Sajet. The phone call had more in common with a private art gallery than a National Public Trust belonging to the people of the United States, 60 PLUS MILLION of whom voted for Donald J. Trump! Arbitrary personal tastes and bias are the norm in the subjective art world. They should not be part of the Smithsonian National Portrait Gallery which should and always be impartial. The 1963 commission clearly said "Thus, the standards for accepting portraits varied considerably from other galleries." http://siarchives.si.edu/history/national--- portrait---gallery

**BREACH OF FIDUCIARY DUTY**

As the Director of the Smithsonian NPG, Director Kim Sajet bears all of the fiduciary responsibilities as a Trustee Delegate Officer, 'Functional Fiduciary' of the Trust of James Smithson appointed by the Board Of Regents through the Smithsonian Secretary according to Sec. 7 of the Smithsonian Congressional Enactments of the 29th Congress, 1st Session on the August 10th, 1846.

Trustees are legally bound to their duties as fiduciaries and upon choosing a Delegate Officer or 'Functional Fiduciary' are under great responsibility to choose carefully and prudently and then supervise, since they stand to be held liable for the conduct of the Delegate Officer. Delegate Officers are ultimately accountable to the Trustees for their actions as the trustees become liable for their conduct.

Violation of the Duty Of Loyalty, Duty Of Care, Duty Of Impartiality, Duty Of Prudence…

Director Sajet's actions in this case on a multitude of levels violate the Director's Fiduciary Duties as a Trustee Delegate Officer and 'Functional Fiduciary' to the Beneficiaries. The Duty of Loyalty, Duty of Care, Duty of Impartiality, Duty of Prudence, Duty to Disclose to the Testator and to the Beneficiaries for the '…increase and diffusion of knowledge among men' is sadly absent. Director Sajet has shown a complete intentional, willful and reckless disregard for any notions of fiduciary duty due the plaintiff. Nothing in Director Sajet's actions show any conscious care on any level of duty to the Will of Smithson or to the Beneficiaries of the will. Over 60 MILLION U.S. Citizens and Beneficiaries of the Will Of Smithson voted for Donald Trump and for now have been barred from participation by Director Sajet's overt anti---Trump bias in the Smithsonian National Portrait Gallery.

The refusal to show the fine art, hand painted Trump Portrait 'Unafraid And Unashamed' in lieu of the dated 1989 photo of Apple tossing Trump photo was a deliberate slight to create 'zero' interest in visiting the National Portrait Gallery! Who would go out of their way to see that? Art has the power to create conversation and speak on levels where ordinary dialogue fails. Such dialogue was deprived from the People!

Director Sajet's final words to the plaintiff were something like this; 'I am the Director Of the Smithsonian Institution, this application will go no further, you can appeal my decision all you want!'

**CLEAR SMITHSONIAN NATIONAL PORTRAIT GALLERY STANDARDS FOR PORTRAITURE ACCEPTANCE**

1. The Will of James Smithson should permeated every consideration and decision made by

the Smithsonian National Portrait Gallery Director Kim Sajet. Every arbitrary objection the Director made should be considered in the light of these words: "An institution for the increase and diffusion of knowledge among men"

2. Where was the increase of knowledge?

3. Where was the diffusion of knowledge?

4. Where was the 'increase' of the 'existing stock of knowledge'? according to the 'Programme of Organization' the Smithsonian Institution's founding charter by Secretary Henry?

5. Where was the addition of 'new truths'? according to the same charter?

6. Where was the 'benefit' to the beneficiaries the American people?

7. Portraits must be of those who "made a significant contribution to history.' 1962 Portrait Commission

8. Portraits selected must be 'the best likeness possible'. 1962 Portrait Commission

9. 'Original portraits from life, if possible.' 1962 Commission

10. 'In every instance historical significance is judged before artistic merit or the prominence o the artist.' 1962 Portrait Commission.

An objective consideration of these official standards for portraiture acceptance expressed through the congressionally established Smithsonian Institution in the light of the arbitrary opinions and negligent actions of the National Portrait Gallery Director Kim Sajet by an objective, impartial, professional and reasonable person will produce a shock to the conscience at Director Sajet's negligent opinions and actions.

Smithsonian Officials and employees should govern their conduct and opinions with these standards and ethics listed below(compressed version):

"The Smithsonian Institution is a **public trust** whose mission is the increase and diffusion of

knowledge ...the **<u>fiduciary responsibility</u>** ...**We are accountable to the general public... We recognize that the public interest is paramount...** maintain the **highest standards of honesty, integrity, professionalism, and loyalty to the Institution... take care to avoid** conduct... compromise the integrity of or **public confidence... preserve the public trust... an expectation of ethical and professional conduct** in **all** of our activities... **apply to the Institution collectively and to all members... includes Regents**, **staff... must be mindful** that it **is a public trust...** on 2 **behalf of the American public...** marked by **openness... robust communication... Effective transparency... Each member...** with **honesty, integrity, openness, accountability...** that values **respect, fairness**, and **integrity**... **responsible** for being **aware of and complying... All Smithsonian activities...** compliance with **applicable laws**, **regulations**, and international conventions... **<u>All</u>** Smithsonian activities **will be conducted in accordance** with **established policies**, **directives, and procedures...** compliance **with legal** and **ethical requirements.... high standard of ethics and accountability.... ensure compliance... consistency.... are established, disseminated, kept current, and consistently applied at all levels** of the organization... **<u>the highest public trust...</u> prudent and responsible... <u>documentation....</u>** ensures **that legal requirements** are observed and **<u>compliance is documented...</u> that accuracy and intellectual integrity...**We acknowledge and **address diverse values**, **opinions,... consistently applied...** The **Smithsonian values and promotes inclusiveness** and **diversity in all** of its activities... **<u>and points of view...</u>**." Smithsonian Statement of Values and Code of Ethics, 2007

An objective consideration of these guiding official values and ethics on conduct and procedures for officials and employees of the Smithsonian Institution in the light of the arbitrary opinions and negligent actions of the National Portrait Director Kim Sajet by an objective, impartial, professional and reasonable person will produce a shock to the

conscience at Directors neglect of her duties.

**APPEAL TO CHANCELLOR JOHN ROBERTS & THE BOARD OF REGENTS, TRUSTEES OF THE SMITHSONIAN INSTITUTION**

As a result of the Director's actions and taunting final words, Plaintiff did appeal by email to Chancellor John Roberts and the entire Board of Regents, the Trustees of the Smithsonian Institute, exercising his right as a beneficiary of the Will of James Smithson through the Chief Of Staff to the Regents Ms. Wilkinson. In the now 40 plus page appeal to each member of the Regents plaintiff did lay out his case against the partial, biased, anti--- Trump, arbitrary and taunting decision of Director Sajet.

On December 12th, 2016, Plaintiff did mail via certified USPS mail, 3 large packages containing 18 hard copies and 18 large 29" full color prints of the Trump Painting of the 44 page appeal package to each of the members of the Board Of Regents via the Chancellor Of the Board Of Regents Chief Justice Roberts. Plaintiff confirmed they were received by the Office of the Board Of Regents. "If there are multiple trustees, they carry a dual accountability for their own actions, inactions, and decisions as well as those of their co---trustees. At common law, when there were multiple trustees, each had an obligation to participate in trust administration unless otherwise specified. When one trustee breached his or her fiduciary duty, the other trustees were required to compel him or her to redress it." https://www.justia.com/estate---planning/trusts/trustee---duties---and---liabilities/ Members included: Chief Justice John G. Roberts, Jr.; CC: Vice President Elect Mike Pence(Vice President Elect Pence was included since he was soon to become Vice President.); CC: Vice President Joseph R. Biden, Jr.; CC: Senator John Boozman; CC: Senator Patrick J. Leahy; CC:

Senator David Perdue; CC: Representative Xavier Becerra; CC: Representative Tom Cole; CC: Representative Sam Johnson; CC: Barbara M. Barrett CC: Steve Case; CC: John Fahey; CC: Shirley Ann Jackson; CC: Robert P. Kogod CC: Risa J. Lavizzo---Mourey; CC: Michael M. Lynton; CC: John W. McCarter, Jr. CC: David M. Rubenstein.

As of February 8th, 2017 plaintiff has not received acknowledgement from the Board Of Regents or their staff regarding the reception of the packages. The only acknowledgement was via Dr. Richard Kurin who spoke as the representative for the Board of Regents. In the scathing IRC Report regarding a multitude of Smithsonian Fiduciary failures and gubernatorial corruption, on page 19, article 7. we read how even the Board of Regents seem distant from the notion of even being Fiduciaries! https://www.si.edu/content/governance/pdf/IRC_report.pdf

Plaintiff and Beneficiary Raven had specifically appealed to the Trustees Of The Will Of Smithson, the Board Of Regents to avoid having to deal with another Trustee Delegate & 'employee'. Beneficiaries are the essence of any Trust and when a Beneficiary makes a request to the Trustees they are bound by the Fiduciary Duties of Trustees, one of which is the Duty to Disclose. Now obviously in financial matters that would mean the Beneficiary is requesting some level of accounting. In this case the spirit of the duty would be to at least respond to the Beneficiary's appeal in their capacity as Trustees.

Plaintiff's appeal apparently was handed back from the Board Of Regents to a Trustee Delegate and 'employee', Dr. Richard Kurin. Now the Smithsonian Board Of Regents themselves will be liable since they violated the far-reaching laws regarding Trustee Fiduciary Duty especially the Duty of loyalty.

Senator Grassley in his blistering letter to Chancellor John Roberts said: "To be blunt, I have been conducting reviews of tax exempt organizations for a number of years and the actions of the Smithsonian Board of Regents raise as many red flags as some of the worst boards that I have investigated. The American people expect and deserve better." http://www.washingtonpost.com/wp-srv/nation/documents/smithsonian/Grassleyletter.pdf

The old adage about the leopard and its spots sadly rings true in this case no matter how many times the Smithsonian Institution prints it's 'Statement of Values and Code of Ethics.

15 U.S. Code § 80a–35 --- Breach of fiduciary duty

29 U.S. Code § 1109 --- Liability for breach of fiduciary duty 29 U.S. Code § 1105 --- Liability for breach of co---fiduciary

**DR. RICHARD KURIN'S LETTER**

In Dr. Kurin's letter he now assumed the role of spokesperson for the Board Of Regents even though he was not mentioned in the appeal. In his letter Dr. Kurin again cited an arbitrary reason for the refusal. Dr. Kurin now appealed to a 'recent tradition' and 'a long planned event' as sufficient for the rejection. Dr. Kurin claimed the 'long planned' event, (remember this was only 4 weeks after Mr. Trump won the election, so 'long planned' is already suspect unless they had counted on a Clinton win?) which strangely had not come to light until after the media began to be aware of the rejection of the Trump Portrait application. If it was so 'long planned' and obviously such a special event how come it only came to light after the Trump Portrait application issue became public knowledge? And finally what would prevent the National Portrait Gallery showing a second Trump Portrait for the inauguration festivities

since they showed 3 portraits for President Obama in 2013!

Claiming 'recent tradition' as a legitimate objection is a classical logical fallacy and violation of clearly established Smithsonian Standards and practices. An 'appeal to tradition' by Dr. Kurin again circumnavigated the standards established by the Congress appointed Co---Trustees, the Board Of Regents, the ratified 'Programme Of Organization' by Joseph Henry for portraiture acceptance. It claimed that this so called 'recent tradition' was binding and rigid forbidding the showing of any other work of art for such an historic event such as the inauguration of President Elect

Donald J. Trump or even submitting the work for application for future showing. Dr. Kurin claimed that the Smithsonian's so called 'long planned' event with a selection of art from its archives (1989 in this case) superseded the precedent established on January 17th, 2009 and in 2013 of showing of a 'politically' relevant and contemporary work of art related to the historic win of Barack Obama.

Dr. Kurin concluded his letter by saying he had spoken with Dir. Kim Sajet and 'concurred' with her decision. Again the Smithsonian officials now agree together in a 'concurrence' with the arbitrary, personal and unfounded objections of Dir. Kim Sajet. Nowhere is there any documentation to show what that decision consisted of, just a personal undocumented phone call!

Clearly Dr. Richard Kurin has embraced the unlawful actions of Director Sajet and by 'concurrence' made himself accountable and jointly liable for her actions as if they were his own. Dr. Kurin has incriminated himself by willful agreement with the unlawful actions of Director Kim Sajet.

Dr. Kurin again further incriminated the procedural failures in this case by admitting to speaking with Director Sajet and 'concurring' with her decision whilst failing to say what that 'decision' consisted of for the record. Dr. Kurin had the perfect opportunity to shed light on this situation and demonstrate by following agency duty & procedure by indicating in writing where plaintiff's art had missed the mark. But instead he incriminated himself, failed to declare at record the contents of his discussion with Director Sajet.

What Dr. Kurin does accomplish though is a vindication of plaintiff's claims since he confirmed the conversation with plaintiff took place and its negative outcome, the rejection of the Trump Portrait for the inauguration of President Elect Trump. Dr. Kurin's letter did not cite legitimate procedural reason and standards for the rejection of the Trump Painting and so in the absence of those, once can reasonable conclude that his 'concurrence' is with the unlawful actions and decision of Director Kim Sajet.

In the IRC Report about the Smithsonian Institution about the systemic corruption at the Smithsonian, the culture of secrecy is one of the lawless cultures exposed at the Smithsonian Institution. This evasive behavior by Dr. Kurin as to the content of the conversation with Director Sajet to which he concurs, evinces the claim of secrecy as still alive today. https://www.si.edu/content/governance/pdf/IRC_report.pdf

Plaintiff's response to Dr. Kurin's letter which requested information was never answered. Trust Delegate officers are under the same fiduciary burdens as trustees are themselves. "The duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA. At the request of a beneficiary, a fiduciary must convey complete and correct material information to the beneficiary." ERISA

Fiduciary Responsibility and Liability

15 U.S. Code § 80a–35 --- Breach of fiduciary duty

29 U.S. Code § 1109 --- Liability for breach of fiduciary duty 29 U.S. Code § 1105 --- Liability for breach of co---fiduciary

Wrongful Exclusion: NAACP LEGAL DEFENSE, ETC. V. CAMPBELL (1981) United States District Court, D. Columbia. 504 F. Supp. 1365 (D.D.C. 1981) Gesell, District Judge

It appears that in order to have artwork accepted 'on loan' at the Smithsonian Institution, you need to give a $716,000.00 dollar donation, be a member of a board and bear the name Cosby. For Mr. and Mrs. Bill Cosby could loan their Art collection and have it shown even when Mr. Cosby was and continues to be under federal investigation for his alleged sexual crimes and that was justified and accepted by Dr. Kurin!

https://news.artnet.com/art---world/smithsonian---concealed---bill---cosby---donation---316275

https://www.washingtonpost.com/news/arts---and---entertainment/wp/2015/07/15/african---art---museum---director---in---difficult---place---with---bill---cosby---allegations/?utm_term=.f7f6512b05cf

Dr. Richard Kurin neglected to be an impartial and objective professional by his arbitrary and Smithsonian standards violating letter.

Dr. Kurin neglected his duty to care for the Will of James Smithson, the Institutions standards, procedure, values, ethics and most importantly the cry and appeal for help from a trust beneficiary.

Dr. Kurin neglected his duty to follow the 2007 'Smithsonian Statement of Values and Code of

Ethics' which state(condensed version):

"The Smithsonian Institution is a **public trust** whose mission is the increase and diffusion of knowledge …the **fiduciary responsibility** …**We are accountable to the general public… We recognize that the public interest is paramount…** maintain the **highest standards of honesty, integrity, professionalism, and loyalty to the Institution… take care to avoid** conduct… compromise the integrity of or **public confidence… preserve the public trust… an expectation of ethical and professional conduct** in **all** of our activities… **apply to the Institution collectively and to all members… includes Regents**, **staff… must be mindful** that it **is a public trust…** on 2 **behalf of the American public…** marked by **openness… robust communication… Effective transparency… Each member…** with **honesty, integrity, openness, accountability…** that values **respect, fairness**, and **integrity**… **responsible** for being **aware of and complying… All Smithsonian activities…** compliance with **applicable laws**, **regulations**, and international conventions… **All** Smithsonian activities **will be conducted in accordance** with **established policies**, **directives, and procedures…** compliance **with legal** and **ethical requirements…. high standard of ethics and accountability…. ensure compliance… consistency…. are established, disseminated, kept current, and consistently applied at all levels** of the organization… **the highest public trust… prudent and responsible… documentation….** ensures **that legal requirements** are observed and **compliance is documented… that accuracy and intellectual integrity…**We acknowledge and **address diverse values**, **opinions,… consistently applied…** The **Smithsonian values and promotes inclusiveness** and **diversity in all** of its activities… **and points of view….**" Smithsonian Statement of Values and Code of Ethics, 2007

An objective consideration of these official standards of the Smithsonian Institution in the

light of the arbitrary opinions and negligent actions of the Smithsonian Acting Provost, Dr. Richard Kurin by an objective, impartial, professional and reasonable person will produce a shock to the conscience at Dr. Kurin's opinions and actions.

**ACTIONS OF SMITHSONIAN SPOKESWOMAN LINDA ST. THOMAS**

Smithsonian Chief Spokesperson Linda St. Thomas went on record regarding the rejection of the Trump Portrait saying:

""There's a process that we go through when we acquire a work of art, and it has to be decided by the museum's curators and director, so it's a process,"

Smithsonian Institution Chief Spokesperson Linda St. Thomas said;

"We really don't need to go through such a process since we already have our own.""

WETM18 NEWS:http://www.mytwintiers.com/news/local-news/smithsonian- institution-rejects-elmira-artists-trump-painting/617527260

In another media interview regarding the rejection of the Trump Portrait St. Thomas finally closed the door on the beneficiary slighting, congressional standards ignoring and fiduciary law breaking world of the Smithsonian by saying;
"You don't apply to have portraits or artifacts taken into the Smithsonian," "St. Thomas added,(referring to the 2009 showing of the Obama 'Hope' Poster added) "We had the original art work for that [Obama] poster. We had no paintings of him or other works. So we used that for the inaugural space for about a one month display in the

middle of January. In this case, in our collection, we had a photograph of president elect Trump and that's the one we're using."" Smithsonian spokesperson Linda St. Thomas told The Daily Caller Tuesday.
Read more: http://dailycaller.com/2016/12/13/smithsonian-says-no-to-new-york- artists-trump-portrait/#ixzz4TIWzanuZ

The truth was that the Smithsonian NPG was already showing a photo of Barack Obama in December 2008. "Barack Obama is the Man of the Moment at the Portrait Gallery" and that exhibition would last until September of 2009! So by the time the Inauguration in 2009 came there would be 2 Obama portraits on show at the same time and in 2013 there would be 3 relevant, fresh, new, current portraits on show at the NPG. But for the inauguration of President Elect Trump, the Smithsonian NPG rejects a relevant, new, fresh portrait of art for an old, dated, 1989 photo of Donald Trump tossing an apple in the air!
18 U.S. Code § 1001 --- Statements or entries generally
http://www.smithsonianmag.com/smithsonian-institution/barack-obama-is-the- man-of-the-moment-at-the-portrait-gallery-32753204/

"You Don't Apply…." St. Thomas

Smithsonian Institution FAQ "I would like to donate an object to the Smithsonian Institution. What should I do?
Smithsonian Institution FAQ "The Smithsonian acquires thousands of objects and specimens each year for its collection holdings through donation, bequest, purchase, exchange, and field collecting. The Institution accepts only items that truly fill a gap in the collections and then only after careful consideration by museum curators and directors. Because of this rigorous selection 'process', the Smithsonian adds to its collections only a tiny percentage of what it is

offered." https://www.si.edu/FAQs

Here it is clear of the contradictory and yet unlawful conduct 'concurring' nature of the behavior of the Smithsonian. St. Thomas alludes to a 'process', which in this case has been refused to plaintiff Raven because St. Thomas claims the museum "already (has)have our own." Here the Will Of Smithson does not even exist, '..an institution for the increase and diffusion of knowledge..' Where is the increase of knowledge when the NPG uses an old, dated 1989 photo of Donald Trump for the inauguration instead of the relevant to the campaign Trump Portrait?

That 'process' one would assume would line up any work of art with the congressional standards of acceptance to see if it meets them whether by purchase, donation or loan the standards should remain constant. This was never done for plaintiff Raven. To arbitrarily deny even the 'right' of application based on arbitrary standards is a violation of agency procedure.

Wrongful Exclusion: NAACP LEGAL DEFENSE, ETC. V. CAMPBELL (1981) United States District Court, D. Columbia. 504 F. Supp. 1365 (D.D.C. 1981) Gesell, District Judge 20 U.S.C. § 50 : US Code --- Section 50: Reception and arrangement of specimens and objects of art --- See more at: http://codes.lp.findlaw.com/uscode/20/3/I/50#sthash.fJ6rYrve.xF90HzSk.dpuf

If there was no 'application process' according to Spokeswoman St. Thomas, why did Director Closter forward plaintiff's application to NPG Director Sajet? Why did Director Sajet call Mr. Raven to object to his application? And why did Dr. Kurin concur with Dir. Sajet's rejection of even considering the application if there were not an application process?

One would think that if all the art in the world related to Mr. Trump were what the Smithsonian had in its archives, one would agree to show the one and only old and dated photo! Also one would think that even if in the midst of this 'long planned event' to show an old photo, an institution dedicated to the 'increase and diffusion of knowledge' would welcome a new, contemporary and politically relevant portrait depicting the soon to be inaugurated President of the United States, thus increasing knowledge as was done with the Obama 'HOPE' poster?

The Smithsonian Chief Spokesperson actions are negligent! Disseminating falsehoods to buttress the illegal actions of the National Portrait Gallery Director neglects telling the truth according to Smithsonian procedural standards and Statement of Values and Code of Ethics.

Chief Spokesperson St. Thomas neglected to tell the truth, neglected the duty to present the official standards for portraiture acceptance. Chief Spokesperson St. Thomas neglected to cite accurate information, neglected to be impartial, but instead covered up the un-Smithsonian opinions and actions of the other Smithsonian Officials.

Smithsonian Officials and employees should govern their conduct with these standards and ethics listed below:

"The Smithsonian Institution is a **public trust** whose mission is the increase and diffusion of knowledge …the **<u>fiduciary responsibility</u>** …**We are accountable to the general public… We recognize that the public interest is paramount…** maintain the **highest standards of honesty, integrity, professionalism, and loyalty to the Institution… take care to avoid** conduct… compromise the integrity of or **public confidence… preserve the public trust…**

**an expectation of ethical and professional conduct** in **all** of our activities… **apply to the Institution collectively and to all members… includes Regents**, **staff… must be mindful** that it **is a public trust…** on 2 **behalf of the American public…** marked by **openness… robust communication… Effective transparency… Each member…** with **honesty, integrity, openness, accountability…** that values **respect, fairness**, and **integrity**… **responsible** for being **aware of and complying… All Smithsonian activities…** compliance with **applicable laws**, **regulations**, and international conventions… **All** Smithsonian activities **will be conducted in accordance** with **established policies**, **directives, and procedures…** compliance **with legal** and **ethical requirements…. high standard of ethics and accountability…. ensure compliance… consistency…. are established, disseminated, kept current, and consistently applied at all levels** of the organization… **the highest public trust… prudent and responsible… documentation….** ensures **that legal requirements** are observed and **compliance is documented… that accuracy and intellectual integrity…**We acknowledge and **address diverse values**, **opinions,… consistently applied…** The **Smithsonian values and promotes inclusiveness** and **diversity in all** of its activities… **and points of view….**" Smithsonian Statement of Values and Code of Ethics, 2007

An objective consideration of these guiding official standards and ethics on conduct and procedures for officials and employees of the Smithsonian Institution in the light of the arbitrary opinions and negligent actions of the Chief Spokesperson Linda St. Thomas by an objective, impartial, professional and reasonable person will produce a shock to the conscience at Spokespersons opinions and actions.

## THE NEGLIGENCE OF THE CHIEF NPG CURATOR BRANDON BRAME FORTUNE

The Chief Curator was named in the original application forwarded by Director Closter to the National Portrait Gallery. The Chief Curator has been completely silent in this whole affair. As can be seen in the comments of the other officers, the 'decision' and 'process' requires the input of 'Curators and Directors.' The Chief Curator's silence speaks in its self. Rather than respond as her job description dictates she has taken the position of silence towards the plaintiff. Her specific role is Chief Curator of the National Portrait Gallery so her opinion must be part of this highly important 'duty' and 'process' of pictorially archiving American National History.

As a Federal employee, 'decision maker' Trustee Delegate Officer, she is bound by duty to be involved in this 'process' as it is the nature, function and job description of a 'Chief Curator'. Since Mrs. Fortune's was named as one of the officials required to act in the decision making process in the original application, action is required by law. Both the extended fiduciary duties and the Federal and Smithsonian standards of Ethical Conduct for employees instruct employees to be active in their roles. Her inaction must be explained under discovery.

Where and what is/was the official, of record, documented, informed, un-biased and procedurally correct opinion of the Chief Portrait Art Curator of the Smithsonian National Portrait Gallery?

The 'Chief' curator's opinion was vital to the decision and plaintiff does not know if the Chief Curator was involved in the process as mandated by Smithsonian Procedure. Maybe the Chief Curator disagreed with the Director and was shut out? Maybe the Chief curator was the only person to actually follow procedure and conclude differently than the agenda of the Director? This case must move to trial so discovery so these integral components can be revealed.

The Chief Curator's inaction is pure negligence in the light of the Smithsonian Statement of values and ethics, 2007:

"The Smithsonian Institution is a **public trust** whose mission is the increase and diffusion of knowledge …the **<u>fiduciary responsibility</u>** …**We are accountable to the general public… We recognize that the public interest is paramount…** maintain the **highest standards of honesty, integrity, professionalism, and loyalty to the Institution… take care to avoid** conduct… compromise the integrity of or **public confidence… preserve the public trust… an expectation of ethical and professional conduct** in **all** of our activities… **apply to the Institution collectively and to all members… includes Regents**, **staff… must be mindful** that it **is a public trust…** on 2 **behalf of the American public…** marked by **openness… robust communication… Effective transparency… Each member…** with **honesty, integrity, openness, accountability…** that values **respect, fairness**, and **integrity**… **responsible** for being **aware of and complying… All Smithsonian activities…** compliance with **applicable laws**, **regulations**, and international conventions… **<u>All</u>** Smithsonian activities **will be conducted in accordance** with **established policies**, **directives, and procedures…** compliance **with legal** and **ethical requirements…. high standard of ethics and accountability…. ensure compliance… consistency…. are established, disseminated, kept current, and consistently applied at all levels** of the organization… **<u>the highest public trust…</u> prudent and responsible… <u>documentation….</u>** ensures **that legal requirements** are observed and **<u>compliance is documented…</u> that accuracy and intellectual integrity…**We acknowledge and **address diverse values**, **opinions,… consistently applied…** The **Smithsonian values and promotes inclusiveness** and **diversity in all** of its activities… **<u>and points of view….</u>**" Smithsonian Statement of Values and Code of Ethics, 2007

An objective consideration of these guiding official standards and ethics on conduct and procedures for officials and employees of the Smithsonian Institution in the light of the inaction of the Curator Brandon Brame Fortune by an objective, impartial, professional and reasonable person will produce a shock to the conscience at the Chief Curator of the National Portrait Gallery's willful silence and inaction.

Government officials and employees who bury their head in the sand to avoid fulfilling their sacred trust responsibilities and duty to the American people, deserve severe consequences for their 'inaction.'

It is their duty to 'act'!

**Negligence**: "A failure to behave with the level of care that someone of ordinary prudence would have exercised under the same circumstances. The behavior usually consists of actions, but can also consist of omissions when there is some duty to act " https://www.law.cornell.edu/wex/negligence

**15 U.S. Code § 80a–35 --- Breach of fiduciary duty**

**29 U.S. Code § 1109 --- Liability for breach of fiduciary duty 29 U.S. Code § 1105 --- Liability for breach of co---fiduciary**

**5 U.S. Code § 552 articles (a)(2)(A)(B), 5 U.S.C. § 706 (1) (2)(A)(B)(C) (D) (E)**

**FIDUCIARY LIABILITY OF THE U.S. CONGRESS AND CONGRESSMAN ROY BLUNT**

The unlawful actions of the federal officials and officers, trustee delegates, functional fiduciaries or employees can cause the 'Superior' to be liable of said actions. With regard to Trusts and Trustees they are bound by a duty not to delegate unless the Will of the testator

and the performance of the Trustee's duty cannot be accomplished. Obviously with the massive expansion of the Smithsonian Institution this is obviously the case. Trustees are obligated continually to delegate duty through the Secretary as directed in the Smithsonian Act. But when the delegated official fail and egregious conduct happens under their watch Trustees are liable.

As mentioned above, since the Board Of Regents ignored plaintiff's appeal, their opportunity for not being liable was lost. Being Co-Trustees and Co-Fiduciaries along with Congress the Trust 'Legatee', the Board Of Regents action or inaction naturally then makes Congress liable and if not liable then at least responsible to act. Thus Congressman Roy Blunt as the Chair of the Committee On Rules and Administration, which has oversight over the Smithsonian, has been named in this suit.

The egregious conduct by the Director Of the National Portrait Gallery Et Al, has made the entire Smithsonian 'Trust' comprising of the Secretary of the Smithsonian, the U.S. Congress and the Board Of Regents liable for breaches of fiduciary duty!

It is impossible to divorce the trustee relationship between Congress and the Board of Regents since Congress is the principal Trustee of the will and trust of Mr. Smithson who appointed the Board of Regents. Can Congress legally, just close their eyes in this case?

## CONCLUSION

There is no doubt that the Smithsonian Institution's founding vision and charter were both noble and generous. The spirit of the institution was built upon broad and curious ideas of great inquiry and learning in the pursuit of truth. As a result, because of the enormous

bequest of Mr. James Smithson, funds were available since the beginning, to give this vision its means to reach for the stars in any and every field of learning it should pursue. One must acknowledge with great respect that which the Smithsonian Trust has achieved and accomplished along with the great good and tangible benefits to millions of its beneficiaries for over a century!

Sadly, history testifies to the nature and influence of corruption to which all institutions eventually succumb. Institutions under the leadership of its leaders, its officers and its trustees can begin to drift from its founding values and before long institute their own ideas and values and eventually the conduct of the Institution becomes completely removed from its founding ideals and values.

IRC REPORT https://www.si.edu/content/governance/pdf/IRC_report.pdf

Secretary Joseph Henry, the pioneering, brilliant and tireless servant of the newborn Smithsonian Institution bore the responsibility of defining the founding charter. He plotted the course of the Institution in the 'Programme Of Organization' once Congress had finally acted in 1846. Mr. Henry's grasp of the nature of the Will of Smithson was pure and uncluttered by any agenda other than that of the testator. The Board Of Regents adopted the charter on December the 13th, 1847

Secretary Henry wrote thus in articles 4---7 of the 'Programme Of Organization';

"The objects of the institution are, 1st, to increase, and 2nd to diffuse knowledge among men. These two objects should not be confounded with one another. The first is to increase the existing stock by the addition of new truths; and the second, to disseminate knowledge, thus increased, among men.

The will makes no restriction in favor of any particular kind of knowledge, hence all branches

are entitled to a fair share of attention.

Knowledge can be increased by different methods of facilitating and promoting the discovery of new truths; and can be most efficiently diffused among men by means of the press.

Sadly as plaintiff's case clearly exemplifies, we see a different spirit has over taken the Smithsonian Institution. The actions of its officers in plaintiff's case evince a willful effort to exclude 'new truths' and forbid the 'increase (of any) knowledge' they despise. The egregious actions of Director Sajet et al, clearly demonstrate hostility to the Will Of James Smithson and to the founding charter, the 'Programme Of Organization'!

They have unapologetically shown their cooperative efforts, which may turn out to be conspiratorial under investigation, to deprive the Institution and thus its Beneficiaries, the American People of an 'increase in the existing stock by the addition of new truths' by refusing a work of art about the now President Of the United States because they are hostile personally, ideologically and politically against President Donald J. Trump.

Director Sajet, who is meant to be an impartial Trustee Delegate Officer and an impartial Federal Employee, even uses her official Smithsonian National Portrait Director's Twitter account to reveal her political bias. On the 20th of January 2017, rather than show the dated apple tossing Trump Portrait that she hung in the NPG in 'celebration' of the inauguration of President Elect Trump, she re---tweets a New York Time's article about the darkness and fear in Washington related to the inauguration of President Trump! Again rather than be impartial and invite people to the NPG to 'celebrate' the inauguration of Donald J. Trump, she posts a photo of herself marching the next day at the 'March for Women' against President Trump! Without any positive tweets about the 'Trump Photo' she hung for the inauguration, it is obvious by exclusion what the NPG Director is saying and it corroborates all of the claims

made by Artist, Trump Grassroots Activist and plaintiff Julian Marcus Raven. Plaintiff Raven will show by a preponderance of evidence that the Smithsonian Institution has a long track record of viewpoint discrimination and bias against ideas and beliefs which are determined to be forbidden and which mainly fall under the categories of Conservative, Republican and Christian ideas and viewpoints. That this systemic, unlawful culture at the Smithsonian Institution is the context in which the actions of Defendants Director Sajet, Chief Curator Brandon Brame Fortune, Dr. Richard Kurin and Linda St. Thomas acted. Their actions are in harmony with this pervasive lawless culture at the Smithsonian Institution and thus their actions are demonstrated to be as claimed! This case is sadly not a surprise!

WHEREFORE. Plaintiff Julian Marcus Raven demands relief, judgment, compensatory and punitive damages against Defendants as follows:

That the Court exercise its discretionary powers over the Smithsonian Trust, its Trustees and their Delegate Officers and suspend the decision made by Director Sajet & Dr. Kurin regarding the rejection of the Trump Painting and order the Trump Portrait 'Unafraid And Unashamed' be considered according to Smithsonian Trust standards and procedure.

That the Court order an immediate 'accounting' or review of the actions, secret conversations and decisions of Director Sajet, Dr. Richard Kurin, Chief Curator Brandon Brame Fortune and Linda St. Thomas.

The Court has discretionary power over the Smithsonian Trust also as a Federal 'Establishment' created by a Congressional Act. Thus the Smithsonian Institution is a Government Agency and according to the verdict in case law NAACP LEGAL DEFENSE, ETC. V. CAMPBELL (1981) United States District Court, D. Columbia. 504 F. Supp. 1365 (D.D.C. 1981) Gesell, District Judge, plaintiff demands comparable consideration due to the merits of

plaintiff's case. "Defendant shall not reject any pending or future application of plaintiffs on this ground." Judge Gesell, U.S. District Court in the District of Columbia.

**COMPENSATORY DAMAGES**

That $10,000,000.00, (ten million dollars) be paid to plaintiff for the 'mental and emotional pain and suffering' as a result of the egregious negligence of the Smithsonian NPG Director Kim Sajet and the rest of the negligent acts or omissions by Smithsonian Officials. The consequences of the Smithsonian Institution's negligence on Mr. Raven's personal and professional life are as follows:

1. Arbitrary opinions, actions and inactions have deeply affected Artist Julian Raven's personal and family life, conversation, disposition and focus. Artists are highly sensitive, perceptive and vulnerable people when dealing with the deepest and most sacred creative expressions of their inner most being. In this case the most important work of art in Artist Julian Raven's career.

2. The initial 'shock' which left Mr. Raven in a fog, as a result of the stunning and arbitrary phone call lasted 2 days, during which time Mr. Raven was unable even to speak about the conversation or even share what had happened with his wife. Artist Julian Raven was silent and walked around in a daze.

3. Since December the 1st, 2016, this injustice has completely interfered in plaintiff's thinking, routine, work as an artist, occupying and consuming much of his time with legal/trial research & preparation as a 'pro se' litigant. Not a day passes without the presence of the lawsuit dynamics, memories, negative feelings, injustices, negligent official actions invading Mr. Raven's thoughts and feelings and routine.

4. Mental anguish, distress, frustration, anger, discouragement and bouts of depression have

darkened plaintiff's door as a result of the actions of the Smithsonian Officials.

5. Art production has been reduced to a snails pace. Artistic focus and creative drive are hard to extract from a wounded and damaged artistic vessel.

6. Julian Raven is unable to stop living 'day to day' without the helpless feeling of frustration and acute awareness that one's rights have been violated by federal officials and government representatives. Complete loss of trust and respect for the Smithsonian Institution. Artist Julian Raven held the Smithsonian in high esteem since a dear family friend's husband, now deceased artist Hertzl Emmanuel has work in the Smithsonian.

7. Plaintiff has suffered embarrassment caused by such negligent conduct in that plaintiff was wrongfully excluded from an event in the historic fine arts that by all accounts plaintiff was qualified to be a participant. Media interviews with the plaintiff surrounding the inauguration of President Trump relating to plaintiff's involvement in the inaugural festivities were marred by the inclusion of this unfortunate case and the negative story created by this unlawful and wrongful exclusion. Local anti-Trump media was unsurprisingly eager to cover the story!

8. Smithsonian and federal officials in this case either by action or inaction caused Artist Julian Raven to suffer 'wrongful exclusion' from this historic, unprecedented and priceless moment in American history and art history. The record will forever show the absence at the NPG of the Trump Portrait 'Unafraid And Unashamed' by not being included as originally requested as a celebratory tribute in the People's National Portrait Gallery to then President Elect Donald J. Trump during this historic election and presidential inauguration. As demonstrated in this case the NPG made great effort to celebrate the inauguration of President Barack Obama with politically relevant art and more in 2009 and 2013, increasing and diffusing historic pictorial knowledge to the American people. But in 2017 the Smithsonian National Portrait Gallery Director et al, deliberately chose to ignore the Will Of its founder Mr. James Smithson and the rights of both the 60,000,000(MILLION) plus Citizens and James Smithson Trust Beneficiaries who voted for Candidate Donald Trump to participation in the fine arts in

an historical pictorial celebration of Donald J. Trump's unprecedented and historic win. This moment was priceless and plaintiff was wrongfully excluded.

Julian Raven is a professional artist and this accomplishment and the artistic recognition that would have followed the showing of his Presidential Portrait for his professional career would have been priceless.

Signed:

Julian Raven

September 29th, 2017

Address: 2524 Co. Rt. 60 Elmira, New York, 14901 PH: 607-215-8711

Email: info@julianraven.com Mr. Julian Raven is representing himself, pro se.

Hunter v. United States, 30 U.S. 173, 188 (1831)

"It is the peculiar province of equity, to compel the execution of trusts."

1

2
3
4
5
6
7
8
9
10
11
12
13