# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |
|---|
| JULIAN MARCUS RAVEN, |
| Plaintiff, |
| v. |
| KIM SAJET, Director, National Portrait Gallery, Smithsonian Institution, *et al.*, |
| Defendants. |

Case No. 1:17-cv-01240 (TNM)

## **MEMORANDUM OPINION**

Artist Julian Raven brought this action against the United States and senior leaders of the National Portrait Gallery over the Gallery's refusal to exhibit his portrait of then-President-elect Donald Trump. Mr. Raven claims that the decision was motivated by political bias, violating his rights under the First and Fifth Amendments. He may be right about the motivation, but he is wrong about the law. The First Amendment's Free Speech Clause does not limit the Gallery's art decisions, because it protects private speech, rather than curtailing government speech. Nor does the Fifth Amendment apply, as Mr. Raven has no legal right to the Gallery's consideration.

Mr. Raven also seeks to amend his complaint by adding claims under the Federal Tort Claims Act, but the Defendants have committed no cognizable tort, even viewing the allegations in the light most favorable to Mr. Raven. Without expressing any opinion about whether the Defendants' decision was right or good, the Court finds that Mr. Raven has not articulated a plausible violation of the Constitution, or the Federal Tort Claims Act. So the Defendants' Renewed Motion to Dismiss will be granted, and Mr. Raven's Motion for Leave to Amend will be denied.

1

# I.

In his last will and testament, James Smithson "bequeath[ed]" a large sum of money "to the United States of America, to found at Washington, under the name of the Smithsonian Institution, an Establishment for the increase and diffusion of knowledge among men." Smithsonian Institution Archives, Last Will and Testament, October 23, 1826, https://siarchives.si.edu/history/featured-topics/stories/last-will-and-testament-october-23-1826; *O'Rourke v. Smithsonian Inst. Press*, 399 F.3d 113, 117 (2d Cir. 2005). Congress accepted the money, *see* David P. Currie, *The Smithsonian*, 70 U. Chi. L. Rev. 65 (2003), incorporating the Smithsonian Institution by federal statute as "an establishment . . . for the increase and diffusion of knowledge among men." 20 U.S.C. § 41. A Board of Regents composed of the Vice President, the Chief Justice of the United States, Members of Congress, and others oversees the Smithsonian. *Id*. § 42.

The National Portrait Gallery is a bureau of the Smithsonian. 20 U.S.C. § 75b(a). It operates "as a free public museum for the exhibition and study of portraiture and statuary depicting men and women who have made significant contributions to the history, development, and culture of the people of the United States and of the artists who created such portraiture and statuary." 20 U.S.C. § 75b(b). The Board of Regents "is authorized to accept . . . gifts of any property for the benefit of the Gallery." 20 U.S.C. § 75d(a).

> The Board may purchase, accept, borrow, or otherwise acquire portraiture, statuary, and other items for preservation, exhibition, or study. The Board may acquire any such item on the basis of its general historical interest, its artistic merit, or the historical significance of the individual to which it relates, or any combination of any such factors . . . [and] display, loan, store, or otherwise hold any such item.

20 U.S.C. § 75(e).

In 2015, Mr. Raven "painted the Donald Trump portrait/painting 'Unafraid and Unashamed.'" Am. Compl., ECF No. 16, at 10. According to Mr. Raven, "[t]he nearly 8x16 foot painting . . . became the most recognized pro-Trump political portrait/painting during the 2015-2016 campaign." *Id*. at 22. After President Trump won the November 2016 election, Mr. Raven sought to have the portrait displayed at the Gallery "as part of the festivities for the 2017 Inauguration." *Id*. at 23. Mr. Raven sent an application—over 20 pages in length, *id*. at 25—by email to the Rockwell Museum, an affiliate of the Smithsonian in Corning, New York. *Id*. at 23-24. After what Mr. Raven felt was a cold initial meeting, the Rockwell Museum informed him by return email "that the Rockwell Museum was unable to help since [it] did not have the 'resources'" to do so. *Id*. at 23-24.

Mr. Raven "subsequently . . . file[d] an official complaint with the Smithsonian Director of Affiliations Harold Closter" for what Mr. Raven considered the Rockwall Museum's "anti-conservative, anti-Trump bias and for failing to simply assist [him] in submitting his application to the [National Portrait Gallery]." *Id*. at 24. The complaint provided a copy of Mr. Raven's application, and Director Closter forwarded the application to the Gallery at Mr. Raven's request. *Id*.

In December 2016, Mr. Raven called and left a message for Kim Sajet, the Gallery's Director, to ask about the application. *Id*. at 25. Director Sajet returned Plaintiff's call, beginning what Mr. Raven described as "an eleven minute dialogue and at times argument" during which Director Sajet allegedly stated "her partial, dishonest, arbitrary and personal anti-Trump 'objections' as to why the . . . Gallery would not even consider plaintiff's painting for the application process[.]" *Id*. at 26. Director Sajet's "objections ranged from its size being 'too big[,]' to partially and incorrectly citing a[] [National Portrait Gallery] standard for acceptance,"

3

to her claims that the painting was "too 'Pro-Trump,'" "[t]oo [p]olitical," "not neutral enough," and "no good." *Id.*; *see generally id.* at 26-38. In Mr. Raven's view, "[t]he [p]ainting was refused even before given a fair and objective consideration according to Smithsonian Institution standards." *Id.* at 26. Director Sajet's "final words" to him allegedly were, "I am the Director of the National Portrait Gallery, and this application will go no further, you can appeal my decision all you want." *Id.* at 42.

Mr. Raven then sent a "letter of 'appeal'" to the Board of Regents. *Id.* at 46; *see* Pl.'s Opp. to Defs.' Mot. to Dismiss (Opp.), ECF No. 38 at 84-87 (page numbers designated by ECF). Two days later, Richard Kurin, then Acting Provost of the Smithsonian and Under Secretary for Museums and Research, responded:

> Consistent with recent tradition, the Gallery has long planned to hang a portrait of the President-elect before his Inauguration. A portrait of Mr. Trump from the National Portrait Gallery's collection will be on display at the Gallery beginning January 13, 2017.
>
> The decision about whether to acquire or display a work of art at the National Portrait Gallery rests in the first instance with that museum's director, curators and historians. I have spoken with Kim Sajet, director of the National Portrait Gallery, and concur with her decision to decline your offer and continue with the museum's plan to display a portrait of Mr. Trump from our collections.

Pl.'s Opp'n, ECF No. 38 at 89. By concurring with Director Sajet's decision, Mr. Raven contends, Mr. Kurin "made himself accountable and jointly liable for her actions as if they were his own." Am. Compl. at 48.

Mr. Raven brings this action against Director Sajet and Mr. Kurin in their personal capacities, under the Supreme Court's decision in *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). *See* Am. Compl. 10-11. He alleges that the individual Defendants violated his First and Fifth Amendment rights, *id.* at 11, 38-44, and seeks declaratory judgment, injunctive relief, and monetary damages. *See id.* at 55-60. The Amended

4

Complaint also had claims under the Federal Tort Claims Act (FTCA)—against the United States and the Smithsonian's leaders in their official capacity[1]—but Mr. Raven withdrew those claims without prejudice after he learned that administrative exhaustion was required. Mot. Withdraw FTCA Claims, ECF No. 24; Minute Order of Dec. 22, 2017. Once the Smithsonian's General Counsel issued a final denial of the FTCA claims, ECF No. 47 at 7, Mr. Raven sought leave to amend his complaint and reinstitute that cause of action. Opposed Mot. for Leave to Amend (Mot. Amend), ECF No. 47.

All Defendants moved to dismiss the constitutional claims. Renewed Mot. Dismiss (Mot. Dismiss), ECF No. 33. The Defendants also oppose Mr. Raven's motion to amend his complaint, arguing that amendment would be futile. ECF No. 50.

**II.**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). To avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). "A claim crosses from conceivable to plausible when it contains factual allegations that, if proved, would allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Banneker Ventures, LLC v. Graham,* 798 F.3d

---

[1] The full list of defendants is long. *See* Am. Compl. at 71-72, 74 (naming the United States, "all of the defendants in their official capacities," and "[t]he remaining defendants, Chief Curator Brandon Brame Fortune, Chief Smithsonian Spokesperson Linda St. Thomas[,] the Board Of Regents members[,] and the U.S. Congress represented by Congressman Roy Blunt[,] in their official capacity as federal officers[,] employees of a federal government instrumentality, Trust 'Legatees' and Co-Trustees, fiduciary delegates, [and] functional fiduciaries of the private and individual Will and Trust Of Mr. James Smithson."

1119, 1129 (D.C. Cir. 2015) (cleaned up).  A court must "draw all reasonable inferences from those allegations in the plaintiff's favor," but not "assume the truth of legal conclusions."  *Id*.

"In determining whether a complaint fails to state a claim, [a court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [a court] may take judicial notice."  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

Because Mr. Raven is *pro se*, his complaint must be "liberally construed" and "held to less stringent standards than formal pleadings drafted by lawyers."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Courts may "consider supplemental material . . . to clarify the precise claims being urged," *Greenhill v. Spellings*, 482 F.3d 569, 572 (D.C. Cir. 2007), "including filings responsive to a motion to dismiss."  *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015).  Yet the ultimate standard remains the same.  The plaintiff "must plead 'factual matter' that permits the court to infer 'more than the mere possibility of misconduct.'"  *Atherton v. Dist. of Col. Office of Mayor*, 567 F.3d 672, 681-82 (D.C. Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679).[2]

### III.

#### A.

At the outset, the Defendants argue that this case is moot, at least as to Mr. Raven's request for injunctive relief.  Mot. Dismiss 28.  The Constitution limits federal jurisdiction to

---

[2]  Given these generous standards, the Court will grant Mr. Raven's Motion for Leave to File a Surreply, ECF No. 42, despite the Defendants' opposition, ECF No. 43, considering the brief attached to that motion, ECF No. 42-1(Surreply), as though it had been separately filed.

"actual, ongoing controversies," *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 645 (D.C. Cir. 2011), and the Defendants point out that Mr. Raven wanted the Gallery to display the portrait for the 2017 Inauguration, which is now past. But Mr. Raven is asking for more. His later filings clarify that he wants the Gallery to hang the portrait "at any time," as "a record of history." Opp. 20. He observes that Donald Trump is still President, and he suggests hanging the portrait in November 2018, January 2019, or January 2020. *Id.* Given the obligation to construe Mr. Raven's filings liberally, *Brown*, 789 F.3d at 152, the Court finds that this request presents an ongoing controversy and is not moot.[3]

That said, Mr. Raven's constitutional claims fail as a matter of law. Because the Smithsonian is a government entity and the Gallery's art selection decisions constitute government speech, the First Amendment does not limit the Gallery's ability to say what it wants to say. And the Fifth Amendment has no application either, for reasons explained below.

Despite Mr. Raven's arguments to the contrary, the Smithsonian is a government entity. In *Crowley v. Smithsonian Inst.*, the D.C. Circuit repeatedly referred to the Smithsonian as "government" for First Amendment purposes, rejecting an Establishment Clause challenge to two exhibitions on evolution. 636 F.2d 738, 744 (D.C. Cir. 1980). The Smithsonian is an "independent establishment of the United States," and thus a "federal agency" under the Federal Tort Claims Act. *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst.*, 566 F.2d 289, 296 (D.C. Cir. 1977) (citing 28 U.S.C. § 2671). The court reasoned: "[a]lthough the Smithsonian has a substantial private dimension . . . the nature of its function as a national museum and center of scholarship, coupled with the substantial governmental role in funding and

---

[3] The Court has jurisdiction over the case generally, since it raises questions of federal law. 28 U.S.C. § 1331.

7

oversight, make the institution an 'independent establishment of the United States,' within the 'federal agency' definition." *Id.* The Second Circuit reached a similar conclusion in *O'Rourke*, 399 F.3d at 122 ("We conclude that the Smithsonian is within the term "the United States" in 28 U.S.C. § 1498(b).").

To be sure, the Smithsonian is no typical federal agency. Its unusual origins, combined with the fact that it has leadership from all three branches of government, means that "the Smithsonian lacks both the 'authority' necessary for it to qualify as an "authority of the government of the United States" under [5 U.S.C.] § 551(1) [Administrative Procedure Act] and the executive department status necessary under [5 U.S.C.] § 552(f) [Freedom of Information Act]." *Dong v. Smithsonian Inst.*, 125 F.3d 877, 883 (D.C. Cir. 1997). But that does not alter the Smithsonian's government status for constitutional purposes.

Consider the case of another odd federal bird, Amtrak. In *Lebron v. Nat'l R.R. Passenger Corp.*, the Supreme Court held that Amtrak was a part of the government "for purposes of the First Amendment." 513 U.S. 374, 394 (1995). *LeBron* noted that Congress had expressly exempted Amtrak from federal "agency" status in its charter, which provided immunity from the Administrative Procedure Act, *id.* at 392, just like the Smithsonian. *See Dong*, 125 F.3d at 883. But the Court reasoned:

> If Amtrak is, by its very nature, what the Constitution regards as the Government, congressional pronouncement that it is not such can no more relieve it of its First Amendment restrictions than a similar pronouncement could exempt the Federal Bureau of Investigation from the Fourth Amendment. The Constitution constrains governmental action "by whatever instruments or in whatever modes that action may be taken." *Ex parte Virginia*, 100 U.S. 339, 346–347 (1880).

*Lebron*, 513 U.S. at 392. *LeBron* went on to conclude that "where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains

8

for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Id*. at 399. Although the Smithsonian is not a corporation, the salient factors considered in *LeBron* lead to a similar conclusion here.

Mr. Raven seizes on the fact that Amtrak was created for governmental purposes, arguing that the Smithsonian, by contrast, is a trust that must seek "the increase and diffusion of knowledge," not whatever objectives the government chooses. Opp. 5-6, 8-9; *see also Dong*, 125 F.3d at 881, 883 (noting that the Smithsonian was created "pursuant to a trust bequest," and "the United States, as trustee, holds legal title to the original Smithson trust property and later accretions."). But even if "the increase and diffusion of knowledge" was originally a private goal, Congress ratified it, and the United States now has complete discretion in how to fulfill it. In any event, *LeBron* relied more heavily on the federal government's control over Amtrak's board than on its federal purposes. 513 U.S. at 397 ("That Government-created and -controlled corporations are . . . part of the Government itself has a strong basis, not merely in past practice and understanding, but in reason itself.").

Mr. Raven also argues that entities in other government speech cases have been more classic manifestations of government authority—municipal governments in *People for the Ethical Treatment of Animals, Inc. v. Gittens* (*PETA*), 414 F.3d 23, 28 (D.C. Cir. 2005), and in *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009), a state government in *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015), and Congress in *Pulphus v. Ayers*, 249 F. Supp. 3d 238 (D.D.C. 2017). Opp. at 6. Traditional government actors are subject to political restraints, Mr. Raven points out, echoing the Supreme Court's observation that "a government entity is ultimately 'accountable to the electorate and the political process for

its advocacy.'" *Summum*, 555 U.S. at 468 (citation omitted). In contrast, Mr. Raven argues, the Smithsonian's "trustees and their assistants do not qualify for 'Gov. Speech' powers . . . since they cannot be voted out!" Opp. 7.

It is true that the Smithsonian, Cerberus-like, sports heads from the Executive, Legislative, and Judicial Branches. 20 U.S.C. § 42. But political accountability persists. Of the eight Regents who serve because of their federal office, voters could defenestrate seven: "the Vice President . . . three Members of the Senate, [and] three Members of the House of Representatives." *Id*. The nine remaining Regents are appointed by politically-accountable representatives in Congress. *Id*. § 43. These Regents are empowered to control the "business of the Institution." *Id*. § 42. In sum, despite its philanthropic mien, the Smithsonian is a government institution through and through. With substantial federal funding, federally-approved leadership, and creation through private gift and federal charter, the Smithsonian is part of the United States government for purposes of the First Amendment. *See Crowley*, 636 F.2d at 744.

That conclusion brings us close to deciding Mr. Raven's speech claim, because when the government speaks, the First Amendment's Free Speech Clause does not limit what it says. *Summum*, 555 U.S. at 467. And government speech includes decisions about what pieces of art it will patronize and display. *PETA*, 414 F.3d at 28.

In *PETA*, the District of Columbia's Commission on the Arts and Humanities created a "Party Animals" art program, under which artists could submit "creative, humorous" designs for standard size sculptures of elephants and donkeys. *Id.* at 25. The Commission would temporarily install winning entries around the city, to display a "whimsical and imaginative side of the Nation's Capital." *Id*. In addition to general submissions, the Commission also allowed

10

submissions from individuals and organizations who paid $5,000, while reserving ultimate "design approval." *Id*. at 26. PETA sent in a $5,000 check and submitted several successive elephant designs alleging animal abuse in the circus. The Commission rejected each design, calling them "political billboard[s], not art," and "not an artistic expression consistent with the goals, spirit and theme of the art project." *Id*. PETA challenged the rejection as a government restriction on free speech.

The D.C. Circuit rejected that argument. Reasoning that "[t]he First Amendment's Free Speech Clause does not limit the government as speaker," the court explained that the government's decision to select specific art designs constituted government speech. *Id*. at 28. The court held that public forum analysis and the judicial scrutiny that comes with it do not apply to "the government's role as patron of the arts," *id*. at 29, where the government is forced to "make esthetic judgments" that courts should not police. *Id*. at 29 (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 586 (1998)). "The curator of a stateowned museum, for example, may decide to display only busts of Union Army generals of the Civil War, or the curator may decide to exhibit only busts of Confederate generals. The First Amendment has nothing to do with such choices." *Id.* at 28.

"There may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech." *Summum*, 555 U.S. at 470. In determining whether to apply public forum analysis or the government speech doctrine, the Supreme Court has looked to "(1) whether the medium at issue has historically been used to communicate messages from the government; (2) whether the public reasonably interprets the government to be the speaker; and (3) whether the government maintains editorial control over

11

the speech." *Pulphus*, 249 F. Supp. 3d at 247 (citing *Walker*, 135 S. Ct. at 2247–49; *Summum*, 555 U.S. at 470–72).

The D.C. Circuit's decision in *PETA* ably anticipated the test that the Supreme Court applied in *Walker* and *Summum*. In *PETA*, the court carefully parsed what constituted government speech, before rejecting a public forum analysis.

> As to the message any elephant or donkey conveyed, this was no more the government's speech than are the thoughts contained in the books of a city's library. . . . Those who check out a Tolstoy or Dickens novel would not suppose that they will be reading a government message. But in the case of a public library, as in the case of the Party Animals exhibit, there is still government speech. With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude. In the case before us, the Commission spoke when it determined which elephant and donkey models to include in the exhibition and which not to include. In using its 'editorial discretion in the selection and presentation of' the elephants and donkeys, the Commission thus 'engage[d] in speech activity'; 'compilation of the speech of third parties' is a communicative act.

*PETA*, 414 F.3d at 28 (quoting *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)).

A judge in this District recently applied the same logic to reject a similar challenge. In *Pulphus*, a young artist and his Congressman brought a First Amendment suit over the Architect of the Capitol's decision to remove his painting from the walls of the Capitol. 249 F. Supp. 3d at 240. The painting had been selected through the Congressional Art Competition before an outcry arose over the painting's controversial content, and the Architect subsequently removed it. *Id.* at 241-44. Applying the Supreme Court's analysis from *Walker* and *Summum* and the D.C. Circuit's logic in *PETA*, Judge Bates concluded that "the art competition and the display . . . constitutes government speech." *Id*. at 253. Because the government was "'using its editorial discretion in the selection and presentation of' the art submitted as part of the competition," *id*.

12

(quoting *PETA*, 414 F.3d at 28), the plaintiffs had "no First Amendment rights at issue." *Id.* at 254.

A similar analysis applies here. First, the National Portrait Gallery has historically communicated messages from the government, in the sense that it compiles the artwork of third parties for display on government property. *See* 20 U.S.C. § 75b(a). Second, the public would reasonably interpret the government to be the speaker, in that it selects specific art for display. Selected artists certainly have a voice in the Gallery, but the government's selection itself conveys a government message: the government considers the artist's work to be worthy of public display and consideration. *PETA*, 414 F.3d at 28; *see also Pulphus*, 249 F. Supp. 3d at 249 ("the public would reasonably associate the art competition, and the art displayed . . . with the government[.] . . . Art displayed on public property is often treated as being endorsed by the government or representative of the government's views"). Finally, the Smithsonian's Board of Regents and its subordinates maintain editorial control over the speech. The Board has expansive authority to accept a portrait "on the basis of its general historical interest, its artistic merit, or the historical significance of the individual to which it relates, or any combination of any such factors." 20 U.S.C. § 75e(1).

This analysis is fatal to Mr. Raven's First Amendment claim. In asking the Gallery to display his portrait, Mr. Raven was asking a component of the federal government to take a "communicative act" by adding his work to its compilation of art created by third parties. *PETA*, 414 F.3d at 28. In other words, he asked for a form of government speech. When the Gallery rejected his submission, it acted as a federal patron of the arts, declining to include the portrait as part of a government-sponsored exhibit. "The First Amendment has nothing to do with such choices." *Id.*

Mr. Raven objects, arguing that Director Sajet's reasons for rejecting his painting ("too big," "not from life," and "too Pro-Trump") were arbitrary, pretextual, and unfair, betraying a political bias against President Trump and his supporters. At the motion to dismiss stage, the Court accepts these well-plead allegations as true. *Iqbal*, 556 U.S. at 678. That said, the Free Speech Clause places no limitations on the content of government speech. Even political discrimination is allowed when the government chooses to sponsor speech. *PETA*, 414 F.3d at 30 ("we can see no First Amendment problem with the Commission making arbitrary or viewpoint-based decisions about which donkeys and elephants it wanted in its parade. No one could plausibly argue that an Inauguration Parade has to have balance, or that the losing Presidential candidate must—if he requests—be allowed to have a float of his own."). And even though Mr. Raven considers the Gallery's motivations to be inappropriate, particularly on the occasion of President Trump's inauguration, the First Amendment simply does not apply to government art selections, no matter how arbitrary. *Id.* at 30 ("[E]sthetic judgments . . . often may appear to be arbitrary, and sometimes are."). For these reasons, Mr. Raven's First Amendment claim must be dismissed.[4]

**B.**

Mr. Raven's claims under the Fifth Amendment fare no better. He asserts violations of its Due Process and Equal Protection Clauses.

---

[4] Many of Mr. Raven's arguments seem to rely not on the Constitution but on the language in Mr. Smithson's will, the statutes governing the Smithsonian, or the Smithsonian's public explanations of portrait acceptance standards. Even if the Court generously construes these arguments as a separate, non-constitutional claim for relief, Mr. Raven has not stated a claim upon which relief can be granted. In theory, the government's speech "may be limited by law, regulation, or practice," *Summum*, 555 U.S. at 468, but the Gallery has what amounts to complete discretion, as a legal matter, to decide which paintings to accept and which to reject. 20 U.S.C. §§ 41, 75(e), 75b, 75d.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property.'" *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) (citation omitted). If no protected interest exists, no due process claim exists. *Id*. "To have a protected property interest in a given benefit, 'a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Id.* (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005).

Under the due process rubric, Mr. Raven argues that he had a constitutionally protected property right to apply for his portrait's acceptance, which the Smithsonian violated by subjecting him to an unfair, biased process. *See, e.g.*, Am. Compl. 15-16. But Mr. Raven was not legally entitled to a fair hearing for his application. The Gallery has what amounts to complete discretion in choosing portraits. 20 U.S.C. § 75(e) ("The Board may acquire any such item on the basis of its general historical interest, its artistic merit, or the historical significance of the individual to which it relates, or any combination of any such factors."). Contrary to Mr. Raven's arguments, Am. Compl. 38-39, the Smithsonian's broad calling to increase and spread knowledge, and its general standards for accepting items, confer no particular rights on those who wish to participate. 20 U.S.C. § 75(e); *Town of Castle Rock, Colo.*, 545 U.S. at 756. In its discretion, the Gallery could have simply informed Mr. Raven that it was not interested in his portrait, or even done nothing at all. With no protected constitutional right at stake, Mr. Raven's Due Process claim fails. *Cf. Pulphus*, 249 F. Supp. 3d at 254 ("the argument that the competition

rules are void for vagueness because they may chill plaintiffs' protected speech depends on plaintiffs having speech rights to chill, which the Court has already determined is not the case.").

Mr. Raven also invokes "the equal protection component of the Fifth Amendment's Due Process Clause." Am. Compl. 13 (quoting *Davis v. Passman*, 442 U.S. 228, 235 (1979)); *see Schweiker v. Wilson*, 450 U.S. 221, 227 n.6. (1981) ("[T]he Fifth Amendment imposes on the Federal Government the same standard required of state legislation by the Equal Protection Clause of the Fourteenth Amendment."). He argues that the Defendants arbitrarily deprived him of a fair hearing and rejected his work, Am. Compl. 13, while accepting other comparable art pieces celebrating President Obama, for example. *Id*. at 28-29. It is possible to bring a "class of one" equal protection claim, "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "[T]he purpose of the equal protection clause . . . is to secure every person . . . against intentional and arbitrary discrimination." *Id*. (quoting *Sioux City Bridge Co. v. Dakota Cty., Neb.*, 260 U.S. 441, 445 (1923)) (brackets omitted).

But in the narrow context of this case—where the government may make esthetic choices that may seem arbitrary, *PETA*, 414 F.3d at 30—such principles have no application. After all, the relevant constitutional language forbids that the Government "deny to any person within its jurisdiction the equal protection *of the laws*." U.S. Const. am. XIV (emphasis added). And the Gallery has no legal constraints on its ability to consider or select particular portraits. The most relevant statute suggests that the Board of Regents "*may* acquire any such item on the basis of its general historical interest, its artistic merit, or the historical significance of the individual to which it relates, or any combination of any such factors." 20 U.S.C. § 75(e) (emphasis added).

16

"May" is a permissive term. The law does not require the Board to acquire (or even consider) *any* particular portrait, regardless of its historical interest, artistic merit, or cultural significance.[5] With no legal protections for art applications, *equal* protection cannot be enforced.

## C.

Even if Mr. Raven had successfully stated a violation of the First or Fifth Amendment, his claims for damages under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), would still be dismissed. Qualified immunity protects government officials from civil liability for constitutional violations unless they violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Since the Free Speech Clause does not apply to government art decisions like this one, and no Fifth Amendment rights are at issue, the Defendants did not violate "clearly established" constitutional law, for all the reasons given above.

In any case, damages for constitutional violations are rare and not appropriate here. "[T]he Supreme Court has not authorized a suit for damages based on the First Amendment and warns that extending such remedies to new contexts is 'a disfavored judicial activity.'" *Storms v. Shinseki*, 319 F. Supp. 3d 348, 351 (D.D.C. 2018) (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1848 (2017)). Government art decisions would certainly be a new context, even for a Fifth Amendment *Bivens* claim. And the Judicial Branch's lack of expertise in deciding what constitutes a "rational" art decision (among other factors), counsels strongly against creating a new damages remedy here. If such a remedy should exist, it is the role of Congress to create it.

---

[5] This fact refutes Mr. Raven's argument that he was deprived of "the right to appeal" when Mr. Kurin allegedly ignored the fact that his letter to the Board of Regents was an "appeal." Am. Compl. 13, 46-47. Even if Mr. Kurin's letter could be so construed, no law conferred upon Mr. Raven appeal rights.

**D.**

Finally, Mr. Raven filed a Motion to Amend, which would reinstate his claims under the Federal Tort Claims Act. The Defendants argue that this amendment would be legally futile and should therefore be denied. Opp. Mot. Amend; *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996) ("Courts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss."). The Court agrees.

Under the FTCA, the United States has waived sovereign immunity only for claims:

> [1] against the United States, [2] for money damages . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*FDIC v. Meyer*, 510 U.S. 471, 477 (1994) (quoting 28 U.S.C. § 1346(b)). Under the law of the place where the Defendants' actions occurred—the District of Columbia—Mr. Raven's tort claims do not survive.

Mr. Raven's most prominent tort claim is for breach of fiduciary duty. *See, e.g.*, Am. Compl. 91; *see Beckman v. Farmer*, 579 A.2d 618, 655 (D.C. 1990) (recognizing the tort under District of Columbia law). He argues that the Smithsonian is a trust, since it was created by the will of James Smithson "for the increase and diffusion of knowledge," and that as a trust beneficiary, he is entitled to fair treatment. Am. Compl. 92-93. It is true that the Smithsonian acts as a "trustee," in that it administers "the original Smithson trust property and later accretions." *Dong*, 125 F.3d at 883. But as explained above, the Smithsonian's management has complete, unfettered discretion to determine how best to pursue "the increase and diffusion of

18

knowledge among men," 20 U.S.C. § 41, at least when it comes to the selection of art for the Gallery. 20 U.S.C. § 75(e).

Mr. Raven also claims that the Defendants negligently inflicted emotional distress on him. Am. Compl. 114-15. But as the Defendants point out, the bar for that tort is high indeed.

> "Under District of Columbia law, a plaintiff may make out a claim for negligent infliction of emotional distress in one of two ways." *Clark v. District of Columbia*, 241 F.Supp.3d 24, 30 (D.D.C. 2017). The first method is to satisfy the standards for the "zone of physical danger test" and show that "serious" and "verifiable" mental distress occurred because the defendant's actions caused the plaintiff to be "in danger of physical injury," and as a result the plaintiff "feared for his own safety." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 798 (D.C. 2011) (quoting *Williams v. Baker*, 572 A.2d 1062, 1066 (D.C. 1990)). Alternatively, a plaintiff may "show that (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff." *Id*. at 810–11.

*Kowalevicz v. United States*, 302 F. Supp. 3d 68, 78 (D.D.C. 2018). Mr. Raven cannot satisfy either standard. The rejection of his painting did not put him in a "zone of physical danger," and his relationship with the Defendants was not of the sort "that necessarily implicates [his] emotional well-being." *See id*. Although artists may be "highly sensitive," Am. Compl. 56, and Mr. Raven credibly asserts that this was "the most important work in [his] career," *id*. 56-57, the gatekeepers of the Gallery have no obligation to steward the emotional health of artists.

And even if Mr. Raven contends that the Defendants *intentionally* inflicted his emotional distress (a separate tort), that claim fails as well:

> In the District of Columbia, a prima facie showing of intentional infliction of emotional distress requires "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Sere*

19

> *v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982) (internal quotation marks omitted). To meet the first prong, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* . . . Liability will not ensue for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998).

*North v. Catholic Univ. of Am.*, 310 F. Supp. 3d 89, 94–95 (D.D.C. 2018). Even accepting the worst possible reading of the Defendants' alleged actions, what they did amounted to a professional insult, though partisan and undeserved, against Mr. Raven and his work. Odious they may be, but insults of this kind are not actionable torts under District of Columbia law. No impartial jury could conclude that the Defendant's politically-biased rejection was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*. For these reasons, Mr. Raven's Motion to Amend must be denied as futile.

## IV.

For these reasons, the Court will grant the Defendants' Motion to Dismiss and deny Mr. Raven's Motion for Leave to Amend. A separate order will issue.

Dated: September 19, 2018                                TREVOR N. MCFADDEN, U.S.D.J.